DEPARTMENT OF THE NAVY
OFFICE OF THE GENERAL COUNSEL
WASHINGTON NAVY YARD BUILDING 210
914 CHARLES MORRIS CT SE
WASHINGTON NAVY YARD DC 20398-5540

Counsel for the
Military Sealift Command

January 24, 2007

Mary G. Curcio, Esq.
U.S. Government Accountability Office
Office of the General Counsel
Procurement Law Division
441 G Street, N.W.
Washington, D.C. 20584

SUBJECT: PROTEST OF GEO-SEIS HELICOPTERS, INC.
GAO CASE NO. B-299175; B-299175.2
SOLICITATION NO. N00033-05-R-1004

Dear Ms. Curcio:

AGENCY REPONSE TO GEO-SEIS' SUPPLEMENTAL PROTEST

Pursuant to Bid Protest Regulation § 21.3(d) (4 C.F.R. § 21.3(d)), the Department of the Navy, Military Sealift Command ("MSC") respectfully submits the following response in the above referenced bid protest proceeding.

On January 16, 2007, Geo-Seis Helicopters, Inc., ("Geo-Seis") filed its response to the Agency Report in the subject case. The response raised the following additional grounds of protest:

1. Presidential's late filed first and second Final Proposal Revisions were improperly accepted by MSC and must be rejected.

2. MSC failed to reasonably evaluate Presidential's Personnel Plan in that:

a. MSC failed to reasonably consider the lack of any evidence that Presidential's proposed key personnel were prepared to be engaged as [redacted].

SUITABLE FOR PUBLIC RELEASE

Exhibit 5

b. MSC failed to reasonably consider that an element of Presidential's Personnel Plan involved [redacted].

3. MSC's best value determination was not reasonable because it did not consider [redacted] between Presidential's and Geo-Seis' proposals.

4. MSC improperly failed to consider Presidential's safety record in evaluating Presidential's Quality Assurance Plan and Safety Plan.

For the reasons set forth below, MSC asserts that the additional grounds of protest are without merit and should be dismissed or, alternatively, denied.

BACKGROUND

The following information augments the Contracting Officer's Statement of Facts previously submitted as to the specific matters identified.

**A. Amendments 0009 and 0012.**

On March 14, 2006, the Contracting Officer issued Amendment 0008, which established 2:00 p.m., March 22, 2006, as the time and date for receipt of final proposal revisions ("FPR"). Tab 5.

According to Federal Express ("FedEx") records, Presidential mailed its FPR on Tuesday, March 21, 2006, using FedEx Priority Overnight Service. Tab 66. According to FedEx's website, this service offers delivery by 10:30 a.m. the next business day. Tab 67.

On March 22, 2006, at 12:16 p.m. the Contracting Officer received an email from Presidential stating that FedEx had experienced weather delays and that its FPR would arrive that day, but it was uncertain when. Tab 66. Therefore, prior to closing, the Contracting Officer decided to extend the closing date and time to "obtain maximum competition." Tab 5, Memorandum to the File supporting Amendment 0009. Amendment 0009 changed the date and time for receipt of FPRs to March 23, 2006, at 11:00 a.m. Owing to the time needed to secure the necessary approvals to issue the amendment, it was issued at 2:36 p.m., March 22, 2006. Tabs 65, 69.

According to FedEx records, Presidential's FPR was delivered to the MSC mailroom on March 22, 2006, at 2:33 p.m. Tab 68. This comports with the approximate time the MSC mailroom reports to have received the package. Tab 5, Memorandum to the File supporting Amendment 0009.

On August 4, 2006, the Contracting Officer issued Amendment 0010, which established August 15, 2006, at 2:00 p.m. as the date and time for receipt of the second round of FPRs. Tab 5.

According to FedEx records, Presidential mailed its second FPR on Monday, August 14, 2006, using FedEx Priority Overnight Service. Tab 72.

On August 15, 2006, at 11:49 a.m. the Contracting Officer received an email from Presidential stating that FedEx was

experiencing delays, but that Presidential's submission would be delivered by 12:30 p.m. Tab 70. This was followed by a second email from Presidential received by the Contracting Officer at 1:53 p.m. in which Presidential stated that FedEx claimed it was experiencing weather delay and that FedEx would not guarantee delivery by 2:00 p.m., the closing time. Tab 71. Presidential requested an extension. Therefore, prior to closing, the Contracting Officer decided to extend the closing time and initiated the steps necessary to issue an amendment. Tab 65. The Contracting Officer chose to issue the amendment to maximize competition by permitting Presidential to submit a timely FPR. Tab 5, Memorandum to File supporting Amendment 0012. Amendment 0012, the final amendment to the RFP, extended the closing time to 4:00 p.m., August 15, 2006. Owing to the time needed to secure the necessary approvals to issue the amendment, Amendment 0012 was sent by email to Geo-Seis at 3:29 p.m. and to Presidential at 3:31 p.m. Tabs 65, 73, 74.

According to FedEx records it delivered Presidential's second FPR to the MSC mailroom at 2:17 p.m., August 15, 2006. Tab 72. According to MSC records, after release of Amendment 0012, the MSC mailroom informed the Contracting Officer that it had received Presidential's FPR at 2:30 p.m. Tab 13 at 10.

**B. Evaluation of Presidential's Personnel Plan.**

Section L6.3.2 of the solicitation states:

> (3) Personnel Plan - The offeror shall describe the labor pool from which it intends to draw employees for this contract and a crew rotation plan. The offeror shall provide a strike contingency plan, resumes for proposed key personnel (to include flight hours, license suspension or revocations and accident history for the last five years for pilots). The offeror shall discuss how this personnel plan will minimize the risk of non-performance to the Government.

The solicitation did not address or require the submission of letters of intent or other proof of employment.

The solicitation also incorporated by reference FAR 52.219-14, which provides in part:

> (b) By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for—
>
> (1) Services (except construction). At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

The solicitation did not address nor preclude the use of independent contractors to perform VERTREP services.

In its initial offer of July 13, 2005, Presidential provided resumes (Tab 52 at 52-61), but did not [redacted]. It stated in its Strike Contingency Plan that "[redacted]." Tab 52 at 63. Neither [redacted] were raised during discussions of Presidential's initial proposal. Tabs 36, 37.


SUITABLE FOR PUBLIC RELEASE

In its first FPR dated March 22, 2006, submitted in response to Amendment 0008, Presidential submitted [redacted], which reflected that the [redacted]. Tab 53 at 42, R1-R22. Additionally, its Strike Contingency Plan [redacted]." Tab 53 at 44. The [redacted] was not raised during discussions of its first FPR. Tab 38. The Contracting Officer did send the following to four of the five offerors:

> Proposal must have a statement or contain documentation that wages, fringes and benefits have been discussed with all key personnel proposed under the contract. Are they currently employees of the company? If so, please state such. If not, please ensure documentation is submitted that addresses this issue.

With respect to Presidential's offer the foregoing differed only in that the Contracting Officer concluded with, "[redacted]."

On May 11, 2006, Presidential responded to the Contracting Officer by stating, "[redacted]." Tab 43. Presidential also commented [redacted]


SUITABLE FOR PUBLIC RELEASE

[redacted]. Id. [redacted].

On June 30, 2006, the Contracting Officer sent Presidential an email noting that the Strike Contingency Plan in its first FPR stated that [redacted]. The email made no other reference to the solicitation. Tab 34. Presidential responded by email on July 5, 2006, stating that, "[redacted]."

In its second FPR of August 15, 2006, Presidential stated with respect to Strike Contingency Plan that, "[redacted]." Tab 57 at 49. Presidential also [redacted].

DISCUSSION

**1. Presidential's first and second FPRs were properly accepted by MSC.**



SUITABLE FOR PUBLIC RELEASE

Geo-Seis' first additional ground for protest, that both of Presidential's FPRs were late and cannot be considered in the evaluation of its proposal, is untimely and should be dismissed. This new ground for protest is nothing more than a protest of Amendments 0009 and 0012 of the solicitation. Bid Protest Regulation 21.2(a)(1) (4 C.F.R. § 21.2(a)(1)) states:

> Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals. In procurements where proposals are requested, alleged improprieties which do not exist in the initial solicitation but which are subsequently incorporated into the solicitation must be protested not later than the next closing time for receipt of proposals following the incorporation.

In the case of Amendment 0009, Geo-Seis was required to protest the extension by 11:00 a.m., March 23, 2006. In the case of Amendment 0012, Geo-Seis had until 4:00 p.m., August 15, 2006, to protest the extension. Geo-Seis did not do so.[1]

Any claim by Geo-Seis that it was unaware of the basis for the extension until it had an opportunity to review the documents accompanying the Agency Report is without merit. MSC timely provided both amendments to Geo-Seis, which chose to do nothing in response. Rather than making an inquiry, it has

---

[1] Even if Geo-Seis asserts it had insufficient time to protest prior to the new closing dates and times, at the very least it should have protested within a reasonable time thereafter if not within ten days of the new closing dates and times in accordance with Bid Protest Regulation 21.2(a)(2) (4 C.F.R. § 21.2(a)(2)).

chosen to wait almost ten months in the case of Amendment 0009 and five months in the case of Amendment 0012 and after an award to protest the solicitation amendments. This Geo-Seis cannot do.

Assuming that Geo-Seis is timely, its first additional ground for protest is without merit. The Government did not accept late proposals. MSC received both FPRs by the closing date and time, as amended. The fact that the amendments were issued after the original closing time is of no moment. As the GAO stated in Ivey Mechanical Company, B-272764, Aug. 23, 1996, 96-2 CPD ¶ 83, "we have repeatedly approved of the issuance of amendments extending closing dates after the expiration of the original closing date when the result is enhanced competition." See also Micromass, Inc., B-278869, Mar. 24, 1998, 98-1 CPD ¶ 93 (agencies may extend the closing date for receipt of proposals after original closing date to enhance competition); Varicon International, Inc., MVM, Inc., B-255808, B-255808.2, Apr. 6, 1994, 94-1 ¶ 240 (amendment extending closing date issued five days after expiration of original closing date to accommodate late offers permissible even absent change in requirement).

In Fort Biscuit Company, B-247319, May 12, 1992, 92-1 CPD ¶ 440, 71 Comp. Gen. 392 (1992), the agency received initial offers from four offerors. All four were asked to submit revised offers. When the agency had not received a revised offer from one of the offerors, it inquired with the offeror and



SUITABLE FOR PUBLIC RELEASE

learned that the offeror had insufficient time to submit its revision. The contracting officer elected to extend the closing date and time. The amendment extending the closing date and time, although signed prior to closing, was not transmitted until after closing. One of the unsuccessful offerors protested the extension, claiming that it was issued too late and that it was issued solely to the benefit the awardee, thereby evidencing government bias.

In denying the protest, the GAO stated that the Federal Acquisition Regulation ("FAR") does not prohibit issuance of amendments extending the closing date after the closing date has passed.[2] Additionally, the GAO held that it was appropriate to extend the closing date to enhance competition, even if it is done at the request of an offeror. The GAO concluded that considering there were "only four offerors," the agency "properly could determine that extending the BAFO due date to maximize the number of offers from which it could choose was a legitimate means of enhancing competition." Fort Biscuit, 92-1 CPD ¶ 440 at 6. The GAO additionally found that the protester had not been prejudiced because it had been given the same time as the awardee to submit a revised proposal.

[2] Although the GAO was considering FAR 15.410(a), there is no substantive difference between that section and FAR 15.206, the corresponding section in the current version of the FAR, that would invalidate the holding of the case.

Similarly, in the instant case there were initially only [redacted], which was [redacted] by the time MSC requested second FPRs. Although the amendments were not issued until after the closing date, the Contracting Officer had decided to issue them prior to the closing date and time. Finally, although the amendments related to the timeliness of a single offer, the amendments were issued on both occasions to enhance competition, which is particularly reasonable here given the length of the procurement and the obvious investment of resources by all offerors. In both instances Presidential experienced mail delays owing to the weather. The GAO has specifically found that extending a closing date for four hours after the expiration of the original date to accommodate weather delay was unobjectionable. See ALM, Inc., B225679, Feb. 13, 1987, 87-1 CPD ¶ 165.

Moreover, Geo-Seis was not prejudiced by the extension, which is an essential element of any protest. Geo-Seis Helicopters, Inc., B-294543, Nov. 22, 2004, 2004 CPD ¶ 237. Both Amendments were issued to all offerors, including Geo-Seis. Geo-Seis was able to submit a timely FPR on both occasions. The fact that Geo-Seis had greater competition for the award is not prejudicial. Consequently, despite Geo-Seis' assertion to the contrary, the Contracting Officer had a reasonable and legally sufficient basis for the issuance of Amendments 0009 and 0012.

Therefore, Geo-Seis' first additional ground for protest should either be dismissed as untimely or denied.

**2. MSC's evaluation of Presidential's Personnel Plan was reasonable.**

a. MSC's consideration of Presidential's key personnel was reasonable.

Geo-Seis makes two assertions to support the first part of its second ground for protest. First, it asserts that Presidential never documented that it had discussed wages, fringes, and benefits with the key personnel it proposed [redacted]. Second, Geo-Seis asserts that Presidential never adequately addressed in its offer that its key personnel would [redacted]. Neither of these assertions have merit.

During discussions on May 3, 2006, the Contracting Officer requested Presidential (as well as other offerors) to provide evidence that it had discussed wages, fringes, and benefits with the key personnel it was proposing. Tab 38. The Contracting Officer's intent was to ensure that there was substance behind the resumes and prices submitted. Tab 65. Presidential [redacted]. Tab 43. The Contracting Officer never again asked Presidential to provide such evidence. Such evidence was not required by the solicitation.

Section L6.3.2(3) of the solicitation, which addressed the Personnel Plan, required submission only of resumes for the key personnel proposed. Tab 5 at 76. Offerors were not required to submit letters of intent; service agreements; or evidence that wages, fringes, and benefits had been discussed with the key personnel being proposed. Therefore, whether wages, fringes, and benefits had been discussed with key personnel would not be considered by the technical evaluators in their evaluation of Presidential's or any offeror's Personnel Plan. In any event, Presidential had complied with the Contracting Officer's request. Thus, Presidential was fully compliant with the requirements of the solicitation and the technical evaluators had sufficient material on which to reasonably base their evaluation of Presidential's Personnel Plan.

Despite Presidential's statement in its May 11, 2006, response to the Contracting Officer, Geo-Seis asserts that Presidential failed to provide appropriate evidence that Presidential had discussed wages, fringes, and benefits with its key personnel. The discussion item sent by the Contracting Officer to Presidential (as well as other offerors) on May 3, 2006, stated in relevant part:

> Proposal must have a statement or contain documentation that wages, fringes and benefits have been discussed with all key personnel proposed under the contract. Are they currently employees of the company? If so,

please state such. If not, please ensure documentation is submitted that addresses this issue.

Geo-Seis argues that the language of the first sentence applies only to key personnel who are employees, in which case offerors were permitted to submit a "statement" or "documentation" as evidence that wages, fringes, and benefits had been discussed with proposed key personnel. With respect to non-employees, however, Geo-Seis asserts that the fourth sentence ("If not, please ensure documentation is submitted that addresses this issue") applies, which limits evidence that wages, fringes, and benefits had been discussed to "documentation." Inasmuch as Presidential provided a statement in its May 11, 2006, response to the Contracting Officer [redacted] (Tab 43), [redacted], Geo-Seis argues that Presidential failed to comply with the Contracting Officer's request for "documentation."

Geo-Seis distorts the substance of the May 3rd discussion item and makes a fine distinction based on somewhat clumsy language. The wording of the May 3rd discussion item evidences no clear intent to make the sort of distinction Geo-Seis urges. In fact, the Contracting Officer intended that a "statement" or "documentation" regarding the discussion of wages, fringes, and benefits be submitted with respect to non-employees only. Tab 65. The lack of parallelism between the wording of the first

and fourth sentences reflects more an unartful attempt to be brief as opposed to a conscious desire to set different evidentiary standards. Therefore, the distinction that Geo-Seis attempts to draw is baseless.

With respect to Geo-Seis' assertion regarding the [redacted] of Presidential's key personnel, there is no confusion. Although Geo-Seis states that Presidential did not adequately address in its second FPR of August 15, 2006, whether the key personnel it offered would be [redacted], it is wrong. Presidential expressly states in its second FPR, "[redacted]." Tab 57 at 49.[3] The fact that Presidential included the [redacted], which were not required by the solicitation, did not negate Presidential's express statement that [redacted]. Moreover, Presidential was free to [redacted] as long as it complied with the subcontracting limitations of FAR 52.219-14.[4]

---

[3] This, therefore, addresses the technical evaluation comment referred to by Geo-Seis in n.6, p. 10 of its supplemental protest.

[4] Additionally, the solicitation did not restrict Presidential from proposing substitute personnel. Section C6.4.1 states only that, "The Contractor must submit any changes in key personnel in writing to the Contracting Officer for approval. Substitute personnel must meet or exceed the qualifications of the personnel they are replacing." Thus, if Presidential was unable to secure the services of any of the key personnel it proposed, it would have had to provide substitutes with qualifications equivalent to those offered and evaluated. Absent evidence that the agency was mislead, the GAO "will not overturn a selection decision merely because the awardee ultimately employs different individuals than those proposed." Airwork Limited-Vinnell



SUITABLE FOR PUBLIC RELEASE

The solicitation did not require the use of full-time employees. Although Presidential addressed the Contracting Officer's concern regarding FAR 52.219-14, that clause does not preclude subcontracting. Furthermore, whether Presidential would comply with that clause is a matter of responsibility, Raloid Corporation, B-297176 Nov. 10, 2005, 2005 CPD ¶ 205, which is reviewed by the Small Business Administration in accordance with FAR 9.104-3(d). Although an award cannot based on a proposal that "on its face, should lead an agency to the conclusion that an offeror could not or would not comply with the subcontracting limitation," Raloid at 8, Presidential's second FPR does not suggest that it would not or could not comply. Therefore, it was reasonable for MSC to conclude that Presidential was responsible (Tab 13 at 14) and in compliance with the solicitation's terms.

Geo-Seis attempts to link evidence of the discussion of wages, fringes, and benefits with the [redacted] of Presidential's key employees [redacted] to create a new solicitation requirement. Neither the solicitation nor the Contracting Officer established such a requirement. Presidential complied with the requests of the Contracting Officer and with the solicitation requirements. Therefore, the

---

Corporation (A Joint Venture), B-285247, B-285247.2, Aug. 8, 2000, 2000 CPD ¶ 150.

first part of Geo-Seis' second additional ground for protest is without merit and should be denied.[5]

**b. MSC reasonably did not consider that Presidential proposed [redacted].**

Geo-Seis argues that MSC failed to consider that Presidential's Personnel Plan [redacted].[6] Geo-Seis asserts that Presidential's Personnel Plan will, therefore, [redacted].

The effect of Presidential's Personnel Plan [redacted]. Fundamentally, there is nothing unusual or improper [redacted]. Anjon Corporation, B-249115, B-249115.3, Oct. 20, 1992, 92-2 CPD ¶ 261. Geo-Seis apparently has no faith in the capabilities [redacted], as it bases its new ground of protest on the assumption that [redacted]. Both assumptions are speculative, which does not

[5] It should be noted that in its second FPR Geo-Seis [redacted]. Tab 64 at 32.

[6] It is interesting to note that of the [redacted] individuals Geo-Seis mentions in its supplemental protest Presidential offered ([redacted]), only [redacted] was included in Presidential's second FPR ([redacted]). Tab 57 at 53.



SUITABLE FOR PUBLIC RELEASE

provide a valid basis for protest. All Phase Services, Inc., B-294640, 2005 CPD ¶ 129 ("An unsupported allegation, which amounts to mere speculation, is insufficient to form a basis for protest"). [redacted]. MSC is confident, even if Geo-Seis is not, that [redacted].

Geo-Seis' assertion that Presidential has allegedly based its Training Plan [redacted] constitutes a dispute between private parties that will not be considered by the GAO absent a credible allegation of Government involvement. LLH & Associates, LLC, B-297804, Mar. 6, 2006, 2006 CPD ¶ 52. There has been no such allegation of Government involvement, nor can there be.

In light of the foregoing, the second part of Geo-Seis' second additional ground for protest is also without merit. Accordingly, Geo-Seis' second additional ground for protest should be either dismissed or denied.

**3. MSC's best value determination was reasonable with respect to the [redacted] between Presidential's and Geo-Seis' proposals.**

In its third additional ground for protest Geo-Seis essentially takes issue with the Source Selection Authority's ("SSA") conclusion that Presidential's and Geo-Seis' offers are



SUITABLE FOR PUBLIC RELEASE

[redacted], a conclusion the SSA reached after review of the technical evaluation, and attempts to substitute its own judgment for that of the SSA and the Contracting Officer. This is not a valid basis for protest. A "protester's mere disagreement with the agency's judgment does not establish that an evaluation was unreasonable." Geo-Seis Helicopters, Inc., supra.

Moreover Geo-Seis was aware at its debriefing of the issue it now raises. At its debriefing Geo-Seis was provided the basis of the tradeoff decision. Protest, Exhibit 1 at 4. Specifically, Geo-Seis was told "[redacted]" If Geo-Seis concluded that the decision as it related to [redacted] was conclusory, it should have protested that matter within ten days of its debriefing, which it did not. It had no more information about the technical trade-off than it did about the past performance trade-off, which it did protest. Therefore, Geo-Seis' third additional ground for protest is untimely.

Even if timely, Geo-Seis' assertions are without merit. It argues that the Source Selection Decision Document ("SSDD") was conclusory in that it failed to reflect the [redacted] between Presidential's and Geo-Seis' offers. Geo-Seis cites to the decision's comparison of the [redacted]

between Presidential's and [redacted] offers to support its position.

For the same reasons already discussed in the Agency Report, the SSA's decision is sufficiently articulated and fully supported. Again, Geo-Seis is reaching for a level of certainty that is not required in a selection decision. Further, what Geo-Seis fails to appreciate is that [redacted] offered a [redacted].

Therefore, it was incumbent upon the SSA to analyze the [redacted] between Presidential's and [redacted] offers to justify the [redacted] of Presidential's proposal. Such [redacted] did not exist between Presidential's and Geo-Seis' offers. Geo-Seis is simply nit-picking in an attempt to gloss over the fact that it offered nothing worth an additional $7.3 million, which to the agency, is not an immodest sum.

Based on the above, Geo-Seis' third additional ground for protest should be either dismissed or denied.

**4. MSC's evaluation of Presidential's Quality Assurance and Safety Plans was reasonable.**

In its final additional ground for protest, Geo-Seis asserts that MSC was required to consider Presidential's safety record

in its evaluation of the latter's Quality Assurance and Safety Plans. This additional ground for protest should be dismissed as an untimely protest of the terms of the solicitation. Section L.7.1 of the solicitation specified the information that was to be submitted with respect to each contract cited for past performance. That information included information on aircraft casualties and aircraft related personnel fatalities over the past five years. Geo-Seis now asserts that the crash information should have been considered in the evaluation of Presidential's Safety and Quality Assurance Plans. As discussed below, neither Section L6.3.2(5), Safety Plan, nor L6.3.2(6), Quality Assurance Plan, specified that such information would be considered. Thus, Geo-Seis is protesting the solicitation's terms.

Bid Protest Regulation 21.2 (4 C.F.R. § 21.2) requires "Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals." Therefore, Geo-Seis' argument that the crash information should have been considered in a manner not provided for on the solicitation's face should have been protested, at the very latest, by August 15, 2006, the closing date for receipt of the second FPRs.

Inasmuch as it was not, Geo-Seis is untimely and its last additional ground for protest should be dismissed.

Even if the manner in which crash information would be evaluated was not apparent of the face of the solicitation, Geo-Seis was informed at its debriefing of how the information was used. As reflected in its initial protest, Geo-Seis inquired at its debriefing how aircraft crash information was evaluated. As it states in its protest:

> On further questioning, MSC admitted that if a proposer had a negative safety record, but if those casualties and fatalities occurred on a contract which was not considered to be relevant, that consideration of safety factors would "drop out" of the assessment. MSC suggested safety might also be considered in a responsibility determination, but acknowledged that it had no knowledge that there was documentation in the record of any consideration of safety factors in the responsibility determination as to Presidential.

Protest at 3. Therefore, at the latest, it should have protested the fact that the crash information was not evaluated as part of Presidential's safety and quality assurance plans within ten days of its debriefing, which it did not in its initial protest based on past performance. Therefore, its final additional ground for protest should be dismissed for this additional reason.

Assuming that Geo-Seis' final additional ground for protest is timely, it lacks merit. Geo-Seis is inventing evaluation considerations that do not exist. Nowhere did the solicitation

state that crash information would be evaluated as part of the Safety and Quality Assurance Plans. With respect to the Safety Plan, Section L6.3.2(5) stated:

> Safety Plan - Provide a comprehensive narrative describing the offeror's safety plan as it relates to aircraft maintenance, personnel and operations, and how this safety plan minimizes the risk of non-performance to the Government.

Tab 5. With respect the Quality Assurance Plan, Section L6.3.2(6) further stated:

> Quality Assurance Plan - This shall consist of a narrative description of the offeror's quality control system and how it will be applied to this contract, and a discussion of how the risk of non-performance will be minimized in this area.

Tab 5, Amendment 7. These factors were forward looking, i.e. how an offeror would perform in the future. For neither factor were offerors directed to address historical aircraft accidents. Consequently, the solicitation did not contemplate that such information would be considered in evaluating the plans. Rather, as the solicitation states, the Government was evaluating offerors' current plans, not their remedial actions taken with respect to aircraft accidents they may have experienced. The fact that the evaluators noted in their evaluation of Geo-Seis' Quality Assurance Plan that Geo-Seis cited [redacted] does not alter the solicitation's evaluation scheme or suggest that Presidential



SUITABLE FOR PUBLIC RELEASE

and Geo-Seis were evaluated differently. Rather, it simply reflects the fact that Geo-Seis chose to [redacted], a fact that was recognized by the evaluators. It was not a matter at which the evaluators independently arrived. Regardless, had consideration been given to Presidential's fixed-wing crash in Afghanistan, its remedial actions in the wake of the 2004 crash, combined with its CARB approval to continue fixed-wing operations could not have been viewed as having an negative influence on its current Safety and Quality Assurance Plans. Therefore, Geo-Seis' final additional ground for protest lacks merit and should be either dismissed or denied.[7]

CONCLUSION

For the foregoing reasons, MSC respectfully submits that the protest should be dismissed or, in the alternative, denied in its entirety.

Respectfully submitted,

/s/

Robert M. Elwell
Associate Counsel

[7] It should be noted that although Geo-Seis makes much ado about the accident reports and that Presidential never provided a copy of the CIB investigation to MSC, the solicitation never required submission of accident reports nor did it state that MSC would consider them.


SUITABLE FOR PUBLIC RELEASE

/s/

Michelle L. Salter
Assistant Counsel

Contracting Officer's Certification

I declare under penalty of perjury that the foregoing facts are true and correct.

/s/

Cathlene Jo Stangler
Contracting Officer

Copy to:
Robert K. Stewart, Jr., Esq.
Davis Wright Tremaine LLP

John E. McCarthy, Jr., Esq.
Crowell & Moring LLP


SUITABLE FOR PUBLIC RELEASE