**Agreed-Upon Redacted Copy**
**May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

| | | |
|---|---|---|
| GEO-SEIS HELICOPTERS, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| THE UNITED STATES, | ) | Civil Action No. 07-155 C |
| Defendant, | ) | (Judge Lettow) |
| and | ) | |
| PRESIDENTIAL AIRWAYS, INC., | ) | |
| Defendant-Intervenor. | ) | |

# GEO-SEIS HELICOPTERS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Robert K. Stewart, Jr.
Counsel of Record

Davis Wright Tremaine LLP
701 W 8th Avenue, Suite 800
Anchorage, Alaska 99501
Phone: (907) 257-5300
Fax: (907) 257-5399

April 27, 2007

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

A. MSC Improperly Accepted Untimely Submittals from Presidential ..... 1

B. MSC's Best Value Determination Was Not Reasonable ..... 2

C. MSC Unreasonably Failed to Consider the Lack of Documentation Concerning Presidential's Proposed Key Personnel ..... 2

II. STATEMENT OF FACTS ..... 3

III. LEGAL DISCUSSION ..... 7

A. Standards of Review ..... 7

B. MSC Improperly Accepted Presidential's Late Filed First and Second Final Proposal Revisions ..... 9

C. MSC's Best Value Determination Was Not Reasonable ..... 19

D. MSC Unreasonably Failed to Consider the Lack of Any Documentation that Presidential Had [redacted] and the Lack of Any Evidence that Presidential's Proposed Key Personnel Were [redacted] ..... 27

E. Geo-Seis Was Actually Prejudiced ..... 33

F. The Court Should Permanently Enjoin MSC from Further Performance of the Contract with Presidential ..... 34

1. Geo-Seis Will Suffer Irreparable Harm if a Permanent Injunction Is Not Issued ..... 34

2. The Balance of Hardships Strongly Favors Geo-Seis Because There Will Be No Meaningful Harm to MSC Since it Is Presently Resupplying Naval Vessels Using Available Military Assets ........ 35

3. It Will Be in the Public Interest to Grant the Permanent Injunction Geo-Seis Has Requested ........ 36

IV. CONCLUSION ........ 36

# TABLE OF AUTHORITIES

## Court Cases

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 (Fed. Cir. 2000) .................................................... 8

Am. Fed'n of Gov't Employees, AFL-CIO v. United States,
258 F.3d 1294 (Fed. Cor. 2001).................................................... 8

Argencord Mach. & Equip., Inc. v. United States,
68 Fed. Cl. 167 (2005) ................................................ 9,11,13,17,18

Bean Dredging Corp. v. United States,
22 Fed. Cl. 519 (1991) ................................................................ 34

Camp v. Pitts,
411 U.S. 138 (1973)...................................................................... 8

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971)...................................................................... 8

Cincom Sys. v. United States,
37 Fed. Cl. 266 (1997) ................................................................ 36

Conscoop-Consorzia Fra Cooperative Di Prod. E Lavoro v. United States,
62 Fed. Cl. 219 (2004) ................................................................ 10

Co-Steel Raritan, Inc. v. Int'l Trade Comm'n,
357 F.3d 1294 (Fed. Cir. 2004) .................................................... 8

FMC Corp. v. United States,
3 F.3d. 424 (Fed. Cir. 1993)........................................................... 9

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) ................................................................ 36

Hosp. Klean of Texas, Inc. v. United States,
65 Fed. Cl. 618 (2005) ........................................................ 9,35,36

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 7, 8

Idea Int'l, Inc. v. United States,
74 Fed. Cl. 129 (2006) .......... 21

Info. Tech. & Applications Corp. v. United States,
316 F.3d 1312 (Fed. Cir. 2003) .......... 8

Keeton Corrs., Inc. v. Unites States,
59 Fed. Cl. 753 (2004) .......... 8

Magellan Corp. v. United States,
27 Fed. Cl. 446 (1993) .......... 34,36

Mangi Envtl. Group, Inc. v. United States,
47 Fed. Cl. 10 (2000) .......... 9

Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) .......... 8

MVM, Inc. v. United States,
46 Fed. Cl. 137 (2000) .......... 35

Overstreet Elec. Co., Inc. v. United States,
47 Fed. Cl. 728 (2000) .......... 34

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) .......... 9

United Payors & United Providers Health Servs., Inc. v. United States,
55 Fed. Cl. 323 (2003) .......... 35

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,
435 U.S. 519 (1978) .......... 8

**GAO Decisions**

ACS Gov't Solutions Group, Inc., B-282098, et al. (June 2, 1999) .......... 21,33

ACS Gov't Servs. Inc., B-293014 (Jan. 20, 2004) ........................................... 33

ALM, Inc., B-225679 (Feb. 13, 1987) ........................................................ 14

Arco Mgmt. of Wash., D.C., Inc., B-248653 (Spet. 11, 1992) ............................ 21

Aztec Dev. Co., B-256905 (July 28, 1994) ................................................... 10

Biospherics Inc., B-278508.4; B-278508.5; B-278508.6 (Oct. 6, 1998) ............... 21

Blue Rock Structures, Inc., B-293134 (Feb. 6, 2004) .................................. 21,22

Caddell Constr. Co., B-280405 (Aug. 24, 1998) .............................................. 10

Century Envtl. Hygiene, Inc., B-279378 (June 5, 1998) .................................... 21

Coastal Mar. Stevedoring, LLC, B-296627 (Sept. 22, 2005) ......................... 21,22

Consol. Servs. Worldwide, Inc., B-290751-7 (Oct. 21, 2002) ............................ 32

Fort Biscuit Co., B-247319 (May 12, 1992) ........................................... 15,16,17

GROH GmbH, B-291980 (Mar. 26, 2003) ..................................................... 34

Inland Serv. Corp., Inc., B-252947, B-252947.4 ......................................... 11,18

Integrated Bus. Solutions, Inc., B-292239 (July 9, 2003) ......................... 12,14,17

ITT Fed. Servs. Int'l Corp., B-289863.4 (Dec. 16, 2002) ................................. 33

Ivey Mech. Co., B-272764 (Aug. 23, 1996) ............................................... 14,15

Johnson Controls World Servs., Inc., B-289942, B-289942.2 (May 24, 2002) ..... 22

KIRA, Inc., B-287573.4, B-287573.5 (Aug. 29, 2001) ..................................... 33

Linguistic Sys., Inc., B-296221 (June 1, 2005) ............................................... 29

Lockheed Martin Info. Sys., B-292836 (Dec. 18, 2003) .................................... 33

MD Helicopters, Inc.; Agusta Westland, Inc., B-298502 (Oct. 23, 2006) ............. 32

Micromass, Inc., B-278869 (March 24, 1998)............................................ 14,15

Phoenix Research Group, Inc., B-240840 (Dec. 21, 1990) ............................ 11,18

PMTech, Inc., B-291082 (Oct. 11, 2002) ................................................... 11,18

Raloid Corp., B-297176 (Nov. 10, 2005) ...................................................... 33

Ready Transp., Inc., B-285283.3, B-285283.4, (May 8, 2001)............................ 23

S.C. Myers & Assocs., B-286297 (Dec. 20, 2000)............................................ 33

Sencland CDC Enter., B-252796, B-25297 (July 19, 1993)................................. 10

Shumaker Trucking and Excavating Contractors, Inc.,
B290732 (Sept. 25, 2002) ............................................................... 23,24,27

Simborg Dev., Inc., B-283538 (Dec. 7, 1999)................................................. 21

Si-Nor, Inc., B-282064; B-282064.2 (May 25, 1999) ................................... 22,23

Symetrics Indus., LLC, B-298759 (Oct. 16, 2006)............................................ 13

Teletara, Inc., B-280922, (Dec. 4, 1998) ........................................................ 21

The Castle Group, B-207853 (March 21, 2006)................................................. 10

Varicon Int'l, Inc., B-255808 (April 6, 1994)............................................. 14,15

Zebra Tech. Int'l, LLC, B-296158 (June 24, 2005)...................................... 18,33

**Statutes**

5 U.S.C. § 706 ............................................................................................. 7

5 U.S.C. § 706(2)(A)........................................................................................ 7

28 U.S.C. § 1491(b)(4)...................................................................................... 7

**Regulations**

FAR § 15.206 ........ 16,17

FAR § 15.206(a)-(c) ........ 16

FAR § 15.207(b) ........ 18

FAR § 15.208(b)(1) ........ 13

FAR §§ 15.305(a) ........ 20

FAR § 15.305(a)(2)(iv) ........ 20

FAR § 15.308 ........ 21,23

FAR § 15.410(a) ........ 15,16,17

FAR § 52.215-1 ........ 1,9,18,36

FAR § 52.215-1(c)(3) ........ 13,18

FAR § 52.215-1(c)(3)(iv) ........ 14

FAR § 52.215-1(c)(3)(ii)(A) ........ 9,11,13,14,15,16,18

FAR § 52.219-14(b)(1) ........ 32

**Other Authorities**

61 Fed. Reg. 48380 (Sept. 12, 1996) ........ 18

62 Fed.Reg. 51233 (Sept. 30, 1997) ........ 18

64 Fed. Reg. 51837 (Sept. 24, 1999) ........ 18

Formation of Government Contracts,
786 (3d ed. 1998) ........ 9

# I. INTRODUCTION

## A. MSC Improperly Accepted Untimely Submittals from Presidential.

The United States Navy, Military Sealift Command ("MSC") improperly accepted late filed final proposal revisions from Presidential Airways, Inc. ("Presidential") on March 22, 2006, and again on August 15, 2006, without adequate legal justification. The material facts concerning the late submittal of Presidential's first and second final proposal revisions are undisputed. On neither occasion was there any evidence that Presidential's final proposal revisions were received at MSC's offices and under MSC's control prior to the time set for receipt of offers. Likewise, on neither occasion was there any evidence that the paramount reason for the late delivery of the Presidential proposal revisions was any improper government action on the part of MSC. On each occasion the fault for the late delivery of Presidential's submittals resulted solely from delays associated with Presidential's chosen delivery service.

As required by the federal acquisition regulations and decisions of this court, MSC should have rejected both of Presidential's final proposal revisions as untimely and evaluated Presidential solely on the basis of the initial proposal it submitted on July 13, 2005. Instead, in both cases it issued amendments extending the final proposal revision deadlines, after those deadlines had come and gone, for the sole benefit of Presidential. In neither case did MSC consider, much less even mention, the requirements of FAR § 52.215-1 which was incorporated by reference in Solicitation No. N00033-05-R-1004 ("Solicitation"). MSC's actions were improper and Presidential's late filed first and second final proposal revisions should have been rejected. Presidential should have been

evaluated, if at all, solely on the basis of the initial proposal it submitted.

B. MSC's Best Value Determination Was Not Reasonable.

MSC's best value determination stated nothing more than "[redacted]" As such, the tradeoff MSC made between Geo-Seis Helicopters, Inc.'s ("Geo-Seis") "[redacted]" past performance and Presidential's [redacted] was wholly conclusory and lacking in any evidence of the type of reasoned analysis which is required by precedent. The best value determination reflected no meaningful consideration of the differences between Presidential's and Geo-Seis' [redacted] evaluations or the consequences those differences could reasonably be predicted to have upon [redacted].

In addition, the best value determination ignored other documented differences between Geo-Seis' and Presidential's [redacted], including Geo-Seis' [redacted] Presidential under [redacted], and the significant differences between Geo-Seis and Presidential under [redacted].

C. MSC Unreasonably Failed to Consider the Lack of [redacted].

The Solicitation required proposers to document that wages, fringes and benefits had been discussed with all key personnel. Presidential never submitted [redacted]

[redacted]. In addition, after it represented that its key personnel would be [redacted], it never submitted [redacted]. MSC's failure to recognize those deficiencies was unreasonable.

## II. STATEMENT OF FACTS

On May 20, 2005, MSC issued the Solicitation for Commercial Helicopter Vertical Replenishment Services. AR 179-306. The Solicitation sought up to three two-helicopter detachments, with deployments staged at approximately one year intervals, to provide ship based and shore based vertical replenishment services, including the movement of stores and ammunition, as well as other duties, such as visual search and rescue, passenger transfer, MEDEVAC and internal cargo transfer, in support of naval vessels in the Pacific. AR 189-91, 289.

The Solicitation contemplated the award of a fixed-price contract for one firm six to twelve month period, with several one year options for the initial and two subsequent detachments. AR 219-20. The Solicitation included four evaluation factors: Technical Quality, Price to the Government, Past Performance, and Socio-Economic Considerations. AR 259-60. The factors were listed in descending order of importance with the non-price factors, when combined, being more important than price. Id. Additionally, the importance of price decreased with the degree of equality of the proposals or when the price was so significantly high as to diminish the value of the technical superiority to the Government. Id. Two subfactors were included under

Technical Quality, Detachment Specifications and Support Concept and Experience, each of which were of equal weight. Id. Two subfactors were included under Detachment Specifications, Airframe Specifications and Mission Capability, each of which were of equal weight. Id. Six subfactors were included under Support Concept and Experience, Maintenance Plan, Logistics Plan, Personnel Plan, Casualty Plan, Quality Plan, and Safety Plan, each of which were all of equal weight. Id.

Presidential, Geo-Seis and four other offerors submitted initial proposals in response to the Solicitation. AR 5. A Technical Evaluation Committee performed a technical evaluation of each proposal. AR 403-16. All of the proposals, including Presidential's, were found to be [redacted]. Id., AR 381.

On March 3, 2006, MSC issued Amendment No. 7 to the Solicitation which, among other things, added an additional technical subsubfactor under Support Concept and Experience. AR 334-36. The new factor gave credit for a proposer's possession of Commercial Airlift Review Board ("CARB") approval for rotary-wing aircraft operations or a plan to obtain such approval within six months of award.[1] Id. That factor was equal to the other six sub-subfactors under Support Concept and Experience. Id.

On March 14, 2006, MSC issued Amendment No. 8 to the Solicitation which established the deadline for final proposal revisions as Wednesday, March 22, 2006, at 2:00 p.m. EST. AR 338-39. However, as documented in a Memorandum to The File, dated March 22, 2006, Presidential's final proposal revision was not received by MSC by that time and date:

---

[1] The CARB administers the United States Air Force, Air Mobility Command's ("AMC") regulations.

3. FPR packages from four out of the five contractors were received in a timely manner.

4. Presidential Airways, Inc. DBA Blackwater Aviation sent MSC an email dated 22 March 2006 at 12:16 PM stating "FedEx had weather delays in Memphis and the package arrives in DC after the driver was dispatched for the day. FedEx advises that it will be delivered today, just not sure when." The MSC Mailroom received the FPR package from Presidential Airways, Inc. on 22 March 2006 at 2:30 PM.

AR 342.

Subsequently, on August 4, 2006, MSC issued Amendment No. 10 to the Solicitation which established the deadline for a second round of final proposal revisions as Tuesday, August 15, 2006, at 2:00 p.m. EDT. AR 343-44. However, Presidential apparently learned nothing from its first experience with Federal Express. As documented in the Post-Negotiation Business Clearance Memorandum:

[redacted]

AR 488.

In each case, MSC improperly accepted the late filed Presidential final proposal revisions and tried to cover its tracks by issuing after the fact solicitation amendments designed to cure Presidential's untimely submittals. On March 22, 2006, at 2:36 p.m. EST, MSC issued Amendment No. 9 which changed the deadline for final proposal revisions to Thursday, March 23, 2006, at 11:00 a.m. EST. AR 340-41, 862.

Amendment No. 9 was issued 36 minutes after the closing time for receipt of proposals and at a point in time when Presidential's first final proposal revision was already late. MSC offered the following justification for the issuance of Amendment No. 9 in its Memorandum to The File, dated March 22, 2006:

> In order to obtain maximum competition for this unique requirement, it is determined that it is in the best interest of the Government to extend the closing date and time for submission of FPR's. This extension will not unduly delay the acquisition.

AR 342. See also AR 486.

MSC again tried to cover its tracks by issuing a second after the fact solicitation amendment designed to cure Presidential's second late submittal in August of 2006. On August 15, 2006, at 2:29 p.m. EDT it issued Amendment No. 12 which changed the deadline for final proposal revisions to Tuesday, August 15, 2006, at 4:00 p.m. EDT. AR 347-48, 863. Amendment No. 12 was issued 29 minutes after the closing time for receipt of proposals and again at a point in time when Presidential's second final proposal revision was already late. MSC offered a similar justification for the issuance of Amendment No. 12 in its Memorandum to The File, dated August 15, 2006:

> This amendment was issued in order to promote greater competition. This amendment was issued in order to allow for the maximum competition among all offerors who remain in the competitive range. Issuing this amendment is in the best interest of the Government.

AR 349. See also AR 488.

In neither case did MSC inform the other proposers, including Geo-Seis, that Amendments Nos. 9 and 12 were being issued because Presidential had submitted late proposal revisions. Geo-Seis only first learned of those facts on January 3, 2007, when it

received the Contracting Officer's Statement of Facts and the bid protest file documents in the GAO protest it filed. AR 8, 10.

After the submittal of the second round of final proposal revisions, the Source Selection Authority ("SSA") determined that [redacted]. That decision is documented in the Source Selection Decision Document ("SSDD"). AR 351-58. Based on that determination, MSC awarded Contract No. N00033-07-C-1004 to Presidential on November 2, 2007. AR 581-684.

## III. LEGAL DISCUSSION

### A. Standards of Review.

Under the Tucker Act, this Court applies the standards prescribed by the Administrative Procedure Act, 5 U.S.C. § 706, in reviewing agency procurement decisions. 28 U.S.C. § 1491(b)(4). Under those standards, the reviewing court determines, among other things, whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency contract award will be reversed where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The reviewing court must determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." Id. at 1332-33. A contracting officer's decision will be found to lack a rational basis where it "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before

the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755 (2004) (quoting Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

To support equitable relief, a plaintiff must show that it was prejudiced by significant error in the procurement process. Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000). In that respect, a disappointed offeror must show that there is a substantial chance that it would have received the award but for the faulty evaluation. Id. "In other words, the protestor's chance of securing the award must not have been insubstantial." Infor. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citing Am. Fed'n of Gov't Employees, AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001); Impresa Construzioni, 238 F.3d at 1334).

In its analysis, the Court must focus on the procurement record, see Camp v. Pitts, 411 U.S. 138, 142 (1973) and must view critically any *post hoc* rationalizations, see Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 549 (1978); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1316 (Fed. Cir. 2004).

In order to obtain an permanent injunction, a plaintiff must show the following: (1) success on the merits of its challenge, (2) that it would suffer irreparable harm if the injunction relief is withheld, (3) that granting the injunction would serve the public interest, and (4) that the harm it would suffer outweighs the harm that the government,

the awardee and any third parties would suffer. See PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); Mangi Envtl. Group, Inc. v. United States, 47 Fed. Cl. 10, 19 (2000) (citing FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)).

B. MSC Improperly Accepted Presidential's Late Filed First and Second Final Proposal Revisions.

The justifications offered by MSC for acceptance of Presidential's late filed final proposal revisions and issuance of Amendments Nos. 9 and 12 were legally insufficient. FAR § 52.215-1 was incorporated by reference in the Solicitation. Exhibit 1, Section L 1.0. That regulation provides, in relevant part, as follows:

> (ii)(A) Any proposal, modification, or revision received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and—
>
> (1) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or
>
> (2) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or
>
> (3) It is the only proposal received.

FAR § 52.215-1(c)(3)(ii)(A).

The requirement that offerors submit their proposals on time is a "strict rule with very limited exceptions." Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 173 (2005) (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 786 (3d ed. 1998)). See also Hosp. Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618, 621-22 (2005) (granting temporary restraining order where there

was likelihood that agency had awarded contract to offeror whose proposal was late); Conscoop-Consorzia Fra Cooperative Di Prod. E Lavoro v. United States, 62 Fed. Cl. 219, 236 (2004) (finding that the agency properly rejected plaintiff's price proposal as untimely because it did not fall within any of the enumerated FAR exceptions).

GAO decisions articulate similarly strict black letter rules governing the rejection of late proposals. An offer is late if it does not arrive at the office designated in the solicitation by the time specified in the solicitation. Sencland CDC Enter., B-252796, B-252797 (July 19, 1993). Where the late receipt results from the failure of an offeror to fulfill its responsibility for ensuring timely delivery to the specified location, the late offer may not be considered. Aztec Dev. Co., B-256905 (July 28, 1994). An offer that arrives late may only be considered if it is shown that the paramount reason for late receipt was improper government action and where consideration of the proposal would not compromise the integrity of the competitive procurement process. Caddell Constr. Co., Inc., B-280405 (Aug. 24, 1998). Improper government action in this context is affirmative action that made it impossible for the offeror to deliver the proposal on time. Id. Mishandling by a proposer's selected delivery service, even when that is the United States Postal Service, does not constitute government mishandling. The Castle Group, B-297853 (March 21, 2006).

Sound policy rationales support strict application of the late submission rules. The late bid rule "may seem harsh, [but] it alleviates confusion, ensures equal treatment of all offerors, and prevents one offeror from obtaining a competitive advantage that may accrue where an offeror is permitted to submit a proposal later than the deadline set for

all competitors." Argencord, 68 Fed. Cl. at 173 (quoting PMTech, Inc., B-291082, 2002 CPD ¶ 172 at 2) See also Zebra Techs. Int'l, LLC, B-296135.2, B-296230.2, 2005 CPD ¶ 120. While the Government may lose the benefit of the special skills and experience of a late submission, "protecting the integrity of the competitive procurement process by ensuring fair and equal treatment among competitors is of greater importance than the possible advantage to be gained by considering a late submission . . . ." Argencord, 68 Fed. Cl. at 173 (quoting Zebra Techs. Int'l. at 2)). See also Inland Serv. Corp., Inc., B-252947, B-252947.4, 93-2 CPD ¶ 266 at 2-3; Phoenix Research Group, Inc., B-240840 (Dec. 21, 1990).

Applying those rules, it is indisputable that Presidential's first and second final proposal revisions were delivered late to MSC. There is no evidence in the record that the paramount reason for the late receipt of Presidential's first and second final proposal revisions on either occasion was any improper government action on the part of MSC. In fact, in each case the late submittals resulted solely from delays associated with Presidential's chosen delivery service. That does not constitute government mishandling.

The justifications offered by MSC for issuance of the two post-hoc amendments by which it attempted to cure Presidential's late deliveries were legally insufficient. The determination that acceptance of a late proposal will not unduly delay an acquisition is a necessary finding under FAR § 52.215-1(c)(3)(ii)(A), but it is not sufficient. Argencord expressly rejects MSC's second proffered rationale, teaching that maximization of competition is subordinate in the hierarchy of governmental interests to protection of the integrity of the procurement process itself "by ensuring fair and equal treatment among

competitors." Once Presidential's final proposal revisions were late, MSC was required to address that circumstance in accordance with the applicable regulation and the terms of the Solicitation. At that point in time, it had no authority to ignore Presidential's lateness and provide Presidential the exclusive benefit of preferential amendments which flew in the face of the "fair and equal treatment" mandated by this court's decisions. MSC's actions hint strongly of deception and the type of favoritism the late submission rules were designed to prevent.

Because Presidential's first and second final proposal revisions were delivered late and there was no improper government action, both of its final proposal revisions should have been rejected and Presidential should have been evaluated, if at all, solely on the basis of the initial proposal it submitted on July 13, 2005.[2] In addition, Presidential should have been eliminated from the competition because its initial proposal, AR 1474-1596, did not contain the required acknowledgements of Amendment Nos. 7 and 11, AR 334-36, 345-46, which changed material terms of the Solicitation. Presidential's initial proposal was, therefore, not viable. Integrated Bus. Solutions, Inc., B-292239, 2003 WL 21659403 at * 3 (Comp. Gen. July 9, 2003). Presidential should also have been deemed ineligible for award because the technical components of its initial proposal that proposal were deemed to be [redacted] across the board. AR 381.

MSC argued before the GAO that its conduct was justified by a line of GAO cases

[2] This assumes Presidential's initial proposal was itself timely. The late filing of Presidential's first and second final proposal revisions and MSC's issuance of brief deadline extensions in those cases raises a substantial questions as to the rationale for issuance of Amendment No. 4 which extended the deadline for submission of initial offers from 2:00 p.m. to 4:00 p.m. on July 14, 2005. Unlike Amendments Nos. 9 and 12, no explanation was contained in the administrative record produced in the prior GAO proceeding for that earlier suspicious extension.

which authorize an agency to extend a proposal submittal deadline and accept a late filed proposal through the issuance of an after the fact amendment extending the deadline where doing so enhances competition. AR 3107-10. For the reasons discussed below, those cases are readily distinguishable both on the law and the facts and have no application here. In addition, they represent a policy view which is inconsistent with the decisions of this court and which has been superseded by more recent GAO decisions which, like this court, place primacy upon protecting the integrity of the competitive procurement process and ensuring fair and equal treatment among competitors even at the potential cost of losing the benefit of more advantageous terms included in a late submission.

First, none of the decisions cited by MSC involved the interpretation and application of FAR § 52.215-1(c)(3)(ii)(A) which was expressly incorporated into this Solicitation. That regulation provides in clear, mandatory language that any proposal or proposal revision received "after the exact time specified for receipt of offers is 'late.'" In equally clear and mandatory language, it states that such proposals "will not be considered" unless the criteria specified in the regulation are met. The decisions of this court applying FAR § 15.208(b)(1), which is essentially identical to FAR § 52.215-1(c)(3)(ii)(A), are equally clear and firm in their language. See, e.g., Argencord, 68 Fed. Cl. at 173 ("the only exceptions permitting acceptance of a late bid are found in FAR 15.208(b)(1)"). GAO decisions applying FAR § 52.215-1(c)(3)(ii)(A) are similarly clear. See, e.g., Symetrics Indus., LLC, B-298759 (Oct. 16, 2006) ("a late proposal revision . . . may only be accepted if one of the exceptions contained in FAR sect. 52.215-1(c)(3) is

applicable"); Integrated Bus. Solutions, Inc., B-292239 (July 9, 2003) (same).

Thus, once Presidential's first and second final proposal revisions failed to arrive at MSC on or before the deadlines established in the Solicitation, then as of those dates and times MSC had no authority to further consider either of Presidential's final proposal revisions unless the requirements of FAR § 52.215-1(c)(3)(ii)(A) were met. Nor could it ignore or evade those requirements by issuing after the fact amendments in an attempt to cure Presidential's defects. The mandatory nature of FAR § 52.215-1(c)(3)(ii)(A) and its incorporation by reference in this Solicitation make any cases, such as those cited by MSC, which do not address and reconcile its provisions readily distinguishable and wholly irrelevant.

Second, the decisions cited by MSC are also readily distinguishable on their facts. ALM, Inc., B-225679 (Feb. 13, 1987), involved a situation where a severe snowstorm impacted the Navy's procurement office operations. ALM does not support the proposition that a post-hoc deadline extension is appropriate where a proposer or its delivery service, as opposed to the government, is experiencing weather delays. Moreover, the principle for which ALM stands is expressly incorporated into the current version of FAR § 52.215-1(c)(3)(iv) (authorizing extensions where an "emergency or unanticipated event interrupts normal Government processes").

Micromass, Inc., B-278869 (March 24, 1998); Ivey Mech. Co., B-272764 (Aug. 23, 1996) and Varicon Int'l, Inc., B-255808 (April 6, 1994) each involved extensions for the receipt of initial proposals, not final proposal revisions, pursuant to which the agency would establish the competitive range. To the extent they remain good law in light of

FAR § 52.215-1(c)(3)(ii)(A), which applies to proposals, modifications and revisions, they only stand for the limited proposition that "[a]gencies may extend the closing date for the receipt of initial proposals after the expiration of the original closing date to enhance competition." Micromass, B-278869, 1998 WL 129882 at *4 (citing Ivey Mech.) (emphasis supplied). Their holdings do not provide authority for extending the closing date for the receipt of final proposal revisions after the expiration of the original closing date for the purpose of enhancing competition. In addition, in both Micromass and Ivey Mech. the agency had only received one initial proposal by the submission deadline and, absent the extensions, there would have been no competition whatsoever. Here, MSC received four timely first final proposal revisions and three timely second timely final proposal revisions. AR 8, 10. Extension of the deadlines was not necessary in this procurement in order to insure adequate competition.

Other material facts distinguish those cases. In Fort Biscuit Co., B-247319 (May 12, 1992), the amendment extending the deadline was actually signed prior to the expiration of the initial deadline. That was not the case here. Similarly, in Micromass, the amendment extending the deadline was issued and posted on the CBD/Net website a full day prior to the initial closing deadline. In Varicon Int'l, the proposer whose submittal was at issue had been told by the agency three days in advance of the deadline that its proposal would be considered timely as long as it was postmarked prior to the deadline. Again, no such equitable considerations were present in this case.

Third, there are substantive differences between FAR § 15.410(a), which the GAO relied upon in Fort Biscuit, Ivey Mech. and other decisions, and the current version of

FAR § 15.206 that undermine the holding of those decisions. The most contemporaneous version of FAR § 15.410(a) to that under consideration in Fort Biscuit which Geo-Seis could locate through Westlaw or http://www.acqnet.gov reads as follows:

> (a) After issuance of a solicitation, but before the date set for receipt of proposals, it may be necessary to (1) make changes to the solicitation, including, but not limited to, significant changes in quantity, specifications, or delivery schedules, (2) correct defects or ambiguities, or (3) change the closing date for receipt of proposals. Standard Form 30, Amendment of Solicitation/Modification of Contract (53.301-30), shall be used for amending a request for proposals (RFP).

FAR § 15.410(a) (FAC 90-34, October 30, 1995).

In contrast, the relevant provisions of FAR § 15.206 provide as follows:

> (a) When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation.
> (b) Amendments issued before the established time and date for receipt of proposals shall be issued to all parties receiving the solicitation.
> (c) Amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition.

FAR § 15.206(a)-(c).

While it may have been true that FAR § 15.410(a) did not prohibit the issuance of amendments extending the closing date after the closing date has passed, see Fort Biscuit, B-247319, 1992 WL 114377 at *2, FAR § 15.206(c) closed that loophole and permits the issuance of amendments after the deadline for proposal submittals has passed only to "offerors that have not been eliminated from the competition." Thus, prior to issuance of Amendments Nos. 9 and 12 to Presidential, MSC had the obligation to determine, through the application of FAR § 52.215-1(c)(3)(ii)(A), whether Presidential was still

eligible for award. Because Presidential's first and second final proposal revisions, including all required acknowledgements of Solicitation amendments, could not have been accepted, see Integrated Bus. Solutions, Inc., B-292239, 2003 WL 21659403 at * 3 (Comp. Gen. July 9, 2003) (initial proposal not viable because it did not contain acknowledgement of amendment changing period of performance which is material term), MSC could not have properly issued Amendments Nos. 9 and 12 to Presidential.[3] Once Presidential's final proposal revisions were late, they could not be revived by subsequent amendments which Presidential never should have received. Argencord, 68 Fed. Cl. at 174. Thus, there are material and dispositive differences between FAR § 15.410(a) and FAR § 15.206 which undermine the continuing precedential value of the Fort Biscuit decision.

Fourth, the balancing of policy interests articulated in the decisions cited by MSC has been superseded by more recent decisions of this court and GAO which place primacy upon protecting the integrity of the competitive procurement process and ensuring fair and equal treatment among competitors even at the potential cost of losing the benefit of more advantageous terms included in a late submission.

> While the government may lose the benefit of more advantageous terms included in a late submission, protecting the integrity of the competitive procurement process by ensuring fair and equal treatment among competitors is of greater importance than the possible advantage to be gained by considering a late submission in a single procurement.

---

[3] Amendment No. 7 which changed the deployment dates for Bravo and Charlie detachments was issued on March 3, 2006, and proposers were required to acknowledge that amendment in their first final proposal revisions. AR 334-36. Amendment No. 11 which changed the deployment dates for Alpha, Bravo and Charlie detachments, as well as the contract performance start date, was issued on August 11, 2006, and proposers were required to acknowledge that amendment in their second final proposal revisions. AR 345-46. Presidential's initial proposal is not viable because it does not contain acknowledgements of those amendments which changed material terms of the Solicitation. Integrated Bus. Solutions, Inc., B-292239, 2003 WL 21659403 at * 3 (Comp. Gen. July 9, 2003).

Zebra Tech. Int'l, LLC, B-296158 (June 24, 2005) (citing Inland Serv. Corp., Inc.; Phoenix Research Group, Inc., B-240840 (Dec. 21, 1990). Accord Argencord, 68 Fed. Cl. at 173; PMTech, Inc., B-291082 (Oct. 11, 2002). A strict application of FAR § 52.215-1(c)(3)(ii)(A) alleviates confusion, ensures equal treatment of all competitors and prevents one proposer, such as Presidential, from obtaining the unfair competitive advantage that accrues where it, and it alone, is permitted additional time to prepare final proposal revisions for evaluation by the agency. Argencord and Zebra Tech. articulate the current policy balance as between the competing interests and teach that maximization of competition is subordinate in the hierarchy of governmental interests to protection of the integrity of the procurement process itself "by ensuring fair and equal treatment among competitors."

Finally, and most telling, during the course of the rulemaking which lead up to the 1997 revisions to FAR 52.215-1, proposed rules were promulgated which would have permitted agencies to accept late submittals where to do so was in the best interests of the government. 61 Fed. Reg. 48380, 48381, 48386, 48392 (Sept. 12, 1996) (proposed versions of FAR 15.207(b) and FAR 52.215-1(c)(3)). However, those proposals were squarely rejected in the final version of the rule. 62 Fed. Reg. 51223, 51259 (Sept. 30, 1997). The commentary makes it clear the intent of the rewrite was "[r]eestablishing the "late is late" rule for receipt of proposals, responses to requests for information, and modifications." Id. at 51224. With minor amendments, 64 Fed. Reg. 51837, 51841 (Sept. 24, 1999), that is the version of the rule in force today. This rulemaking history

compels the conclusion that the cases cited by MSC no longer have any precedential value where the propositions for which they stand were rejected in a formal rulemaking process.

C. <u>MSC's Best Value Determination Was Not Reasonable</u>.

The SSDD reveals that the tradeoff the SSA made between Presidential's [redacted] against Geo-Seis' "[redacted]" past performance was wholly conclusory and lacking in any evidence of the type of reasoned analysis which is required by GAO precedents.

The SSA had an obligation to consider the full depth of Geo-Seis' "[redacted]" Past Performance rating, which was as follows:

[redacted]

AR 362. The Final Summary of Past Performance Evaluations also noted that [redacted]. AR 361.

In contrast, the narrative associated with Presidential's "[redacted]" Past Performance rating provided, in relevant part, as follows:

[redacted]

[redacted]

AR 364.

The SSA's best value determination reflects no meaningful consideration of those differences or the consequences they can reasonably be predicted to have upon [redacted]. Instead, the SSA stated nothing more than that "[redacted]." AR 355. See also AR 113.

Such a conclusory statement is wholly inadequate and fails to document reasoned decisionmaking. The SSA failed to evidence that he actually considered, or explain how he might have concluded, that the [redacted] were justified by the [redacted] cost differential between Geo-Seis' and Presidential's cost proposals. The SSDD reflects no recognition that Presidential had [redacted]. While FAR § 15.305(a)(2)(iv) requires a neutral past performance rating where an offeror does not have an adequate record of relevant past performance, neither that regulation nor any known precedents prevent an agency from considering the specific shortcomings which result in the neutral rating or the narrative contained in a past performance evaluation document.

Decisions of this Court require agencies to engage in an adequate discussion of their reasoning in making a best value determination. See, e.g., Idea Int'l, Inc. v. United States, 74 Fed. Cl. 129, 140 (2006).

Decisions by the GAO are to the same effect. "[An] evaluation must be documented in sufficient detail to show that it was not arbitrary." Simborg Dev., Inc., B-283538 (Dec. 7, 1999) (citing F.A.R. §§ 15.305(a), 15.308; ACS Gov't Solutions Group, Inc., B-282098, et al. (June 2, 1999)). In order for the GAO to review an agency's selection determination, the agency must have adequate documentation to support that decision. Century Envtl. Hygiene, Inc., B-279378 (June 5, 1998); Arco Mgmt. of Wash., D.C., Inc., B-248653 (Sept. 11, 1992). See also Teletara, Inc., B-280922, (Dec. 4, 1998) (agency's lack of documentation demonstrated that the evaluation was "unreasonable on its face").

More importantly, conclusory statements are not sufficient. Biospherics Inc., B-278508.4; B-278508.5; B-278508.6 (Oct. 6, 1998). Where a cost/past performance tradeoff is made, "the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA . . .." F.A.R. § 15.308 (emphasis supplied). A tradeoff determination in favor of a lower-rated, lower-priced proposal that fails to acknowledge significant strengths of the higher-rated proposal and furnish an explanation as to why they are not worth a price premium is not a sufficiently documented tradeoff determination. Coastal Mar. Stevedoring, LLC, B-296627 (Sept. 22, 2005); Blue Rock Structures, Inc., B- 293134 (Feb. 6, 2004).

In Blue Rock Structures, the source selection authority failed to furnish an

adequate rationale for his tradeoff determination and the GAO was therefore unable to conclude that the determination was reasonable. As the GAO has stated in numerous decisions, "[a]n agency that fails to document adequately its source selection decision runs the risk that our Office may be unable to determine that the decision was reasonable." Id. (citing Johnson Controls World Servs., Inc., B-289942, B-289942.2 (May 24, 2002).

> . . . the SSA simply concludes, without any mention of the technical advantages of Blue Rock's higher-rated proposal or a finding that despite its higher rating, Blue Rock's proposal was essentially equal to those of Virtexco and C Construction in technical merit, that the latter two proposals represent better value than the protester's because they are significantly lower in price.

Id. That is directly analogous the SSA's failure in this case to determine, without discussing the advantages of Geo-Seis' proposal, how Presidential's proposal represented better value.

Similarly, in Coastal Mar. Stevedoring, the GAO expressly found, as is the case here, that "the SSA's analysis was further unreasonable in that it failed to take into account the difference in the ratings of the two proposals with regard to performance risk." Id.

Coastal Mar. Stevedoring and Blue Rock Structures do not stand alone. In Si-Nor, Inc., B-282064; B-282064.2 (May 25, 1999), the GAO faced the reverse of the situation present here. There, for the same reasons urged here by Geo-Seis, the GAO found the award to a higher priced offeror with superior past experience was not adequately justified. The tradeoff rationale set forth in the source selection decision stated as

follows:

> I have determined [Eagle]'s proposal to be of better value than [Si-Nor]'s proposal. Both offerors received a low risk rating for experience. However, [Eagle] received an outstanding past performance rating based on their past performance record, meeting all contract requirements and exceeding some of the contract requirements, compared to the satisfactory rating given [Si-Nor]. . . . I believe that [Eagle]'s outstanding past performance outweighs the lower price offered by [Si-Nor], a difference of $858,636.80 for the total cost.

Id.

The GAO found that determination failed to include the type of explanation for the agency's conclusion required by FAR § 15.308. "While the record clearly sets forth the agency's conclusion that Eagle's past performance rating was worth an $858,636.80 price premium, it includes no documentation, evidence or explanation of the benefits that the agency associated with Eagle's superior past performance rating which would outweigh the additional price." Id. The same absence of any documentation, evidence or explanation of the tradeoffs between price and past performance which was fatal in Si-Nor is likewise fatal in this case.

Shumaker Trucking and Excavating Contractors, Inc., B-290732 (September 25, 2002) is particularly instructive and synthesizes Geo-Seis' arguments on this point. In Shumaker, the GAO found that the agency's failure to discuss what, if anything, the offeror's scores actually signified was not a valid substitute for a qualitative assessment of the technical differences between the offers:

> The record contains no evidence that the agency compared the advantages of the awardee's proposal to those of Shumaker's proposal, or considered why any advantages of the awardee's proposal were worth the approximately $400,000 higher price. As we have previously stated, point scores are but guides to intelligent decision making. Ready Transp., Inc.,

> B-285283.3, B-285283.4, May 8, 2001, 2001 CPD ¶ 90 at 12. In this case the Forest Service's tradeoff is inadequate because its mechanical comparison of the offerors' point scores was not a valid substitute for a qualitative assessment of the technical differences between the offers from URS and Shumaker, so as to determine whether URS's technical superiority justified the price premium involved. Opti-Lite Optical, supra, at 5.

The SSA's best value determination in this case, both as to the tradeoff between Presidential's price and Geo-Seis' past performance and his failure to [redacted] between Geo-Seis' and Presidential's technical proposals, was as mechanical as that in Shumaker. The SSA's best value determination reflected no meaningful consideration of the documented [redacted] between Geo-Seis and Presidential or the consequences they could reasonably be predicted to have upon [redacted].

The SSA's best value tradeoff analysis was also lacking in any careful evaluation of the documented [redacted] between Geo-Seis' and Presidential's technical proposals, including Geo-Seis' [redacted], and the [redacted]. While ostensibly recognizing that Geo-Seis' proposal [redacted], the SSA failed to [redacted]. AR 355. That failure stands in stark contrast to [redacted]. AR 356-58. That disparity in treatment between

[redacted] only highlights the shortcomings of the tradeoff analysis between Geo-Seis and Presidential.

A comparison between Geo-Seis and Presidential under 1.0 Detachment Specifications, [redacted], reveals the following material differences:

| RFP<br>1.1 Airframe Specifications | Geo-Seis | Presidential |
|---|---|---|
| Lift Capacity (3,500 lbs w/ 90 min fuel; 4,500 lbs w/ 10% or 20 min fuel | [redacted] | [redacted] |
| Endurance for VERTREP (90 minutes) | [redacted] | [redacted] |
| Endurance for Non-VERTREP (120 minutes) | [redacted] | [redacted] |
| 1.2 Mission Capability | | |
| MEDEVAC Capability (1 patient and 1 corpsman) | [redacted] | [redacted] |
| Carrying Capacity (5 passengers) | [redacted] | [redacted] |
| Internal Payload Capacity (2,000 lbs) | [redacted] | [redacted] |

AR 465-66, 473-74.

A comparison between Geo-Seis and Presidential under various 2.0 Support Concepts and Experience sub-subfactors reveals [redacted]:

| RFP | Geo-Seis | Presidential |
|---|---|---|
| Maintenance Plan | [redacted] | [redacted] |

| | | |
|---|---|---|
| | [redacted] | |
| Logistics Plan | [redacted] | [redacted] |
| Personnel Plan | [redacted] | [redacted] |
| Quality Assurance Plan | [redacted] | [redacted] |
| Safety Plan | [redacted] | [redacted] |
| CARB Approval | [redacted] | [redacted] |

AR 466-68, 474-76.

The SSA simply glossed over those important differences. He failed to acknowledge Geo-Seis' [redacted] over Presidential [redacted]. AR

355. He completely failed to acknowledge [redacted]" and that "[redacted]." Id. The SSA's failure to either recognize or discuss the significant differences [redacted], particularly those [redacted], was unreasonable.[4]

Finally, the SSA never performed a [redacted]. Instead, he stated that [redacted]" Id. He then turned to Geo-Seis' [redacted]. Id. He did not [redacted]. The SSA's failure to implement such a comprehensive evaluation approach was also unreasonable.

D. MSC Unreasonably Failed to Consider the Lack of Any Documentation that Presidential Had [redacted] and the Lack of Any Evidence that Presidential's Proposed Key Personnel Were [redacted].

---

[4] The SSA's [redacted] is underscored by the admission in his declaration that [redacted]." AR 539. That is the very type of mechanical best value determination of which the GAO has repeatedly disapproved. See, e.g., Shumaker Trucking and Excavating Contractors, Inc. B-290732 (September 25, 2002).

In its first final proposal revisions, Presidential submitted [redacted]. AR 1645-1665. Among other things, [redacted] stated that the positions were [redacted]." Id. The [redacted] did not describe [redacted]. Id. ("[redacted]") (emphasis supplied). None of the [redacted] were enclosed. Id.

On May 3, 2006, the Contracting Officer, Cathlene Stangler, sent an e-mail to Presidential's [redacted] with an attached discussion item which stated, in relevant part, as follows:

> [redacted]

AR 1127.

Information disseminated during the course of a procurement that is in writing, issued by the contracting officer and provided to all proposers meets all the essential elements of an amendment and, even where not designated as an amendment, is sufficient

to operate as such. Linguistic Sys., Inc., B-296221 (June 1, 2005). The May 3, 2006, communication by Stangler met those criteria.

On May 11, 2006, [redacted] responded, directing Stangler's attention to the [redacted]. AR 1312-1313. [redacted] also stated that "[redacted]" AR 1313. However, although none of those persons were [redacted], [redacted] did not submit [redacted]. Id. In fact, [redacted]." AR 1314-1334. As before, [redacted] were enclosed. Id.

On June 30, 2006, Stangler communicated further with [redacted], directing his attention in the context of [redacted] to the [redacted]. AR 910-11. Specifically, Stangler pointed out [redacted]." Id.

[redacted] responded to Stangler on July 5, 2006, with the following commitment:

[redacted]

[redacted]

AR 910 (emphasis supplied).

However, notwithstanding [redacted] promise, Presidential failed in its second final proposal revisions submitted on August 15, 2006, to adequately address this key concern as well as others which had been raised by MSC. Presidential provided the same [redacted] which clearly identified all of its key personnel as [redacted]. AR 1868-88.

Presidential never submitted any [redacted]. While MSC had informed Presidential that [redacted], MSC clearly instructed Presidential that [redacted].

The only thing Presidential ever offered was a [redacted] previously submitted with Presidential's first final proposal revisions and representing that "[redacted]" AR 1313. However, the [redacted] on their face belied [redacted] representation because [redacted]. AR 1645-65

("[redacted]") (emphasis supplied). Those [redacted] further belied [redacted] representation because [redacted]" Id.

Even assuming Presidential's May 11, 2006, response was satisfactory at that time, Presidential never submitted [redacted], to MSC after its July 5, 2006, communication [redacted].[5] In fact, [redacted] specifically told Stangler that [redacted]. AR 910. There is no evidence that [redacted]. Thus, even assuming that a statement, as opposed to documentation, was sufficient as to key personnel who were not current employees, Presidential failed to [redacted]. MSC's failure to reflect any awareness that Presidential had not adequately addressed this issue was not reasonable.

MSC's Technical Evaluation Report for Final Proposals dated September 13, 2006, does not reflect any awareness that Presidential failed to adequately address any of

---

[5] [redacted]

those issues. AR 474-75.[6] It is completely silent on each of these deficiencies, even though it purports to [redacted]. In light of those several important unresolved issues, it was not reasonable for MSC to [redacted] Presidential's Personnel Plan technical evaluation between its first and second final proposal revisions from "[redacted]" to "[redacted]." Compare AR 451 with AR 475.

MSC argued before the GAO that Presidential adequately addressed the [redacted] when it changed a few words in the [redacted]". AR 3115-17 (citing AR 1862). Compare AR 1667.

That argument ignores the fact that, at best, that change did nothing more than create an internal inconsistency in Presidential's second final proposal revisions. Presidential's second final proposal revisions contained the same [redacted] as were submitted with its first final proposal revisions. AR 1868-1888. Those [redacted] clearly stated that [redacted]." Id. It is reasonable to reject an ambiguous proposal that contains internal inconsistencies. Consol. Servs. Worldwide, Inc., B-290751.7 (Oct. 21, 2002). See also MD Helicopters, Inc.; AgustaWestland, Inc., B-298502 (Oct. 23, 2006) (agency found

[6] This is particularly striking because just 6 days before the technical evaluation team met on August 24, 2006, its team leader recognized that Presidential's revised final proposal needed to "[redacted]." AR 461.

weakness associated with inconsistent production plan); Lockheed Martin Info. Sys., B-292836 (Dec. 18, 2003) (protest sustained, agency failed to evaluate proposal thoroughly and recognize inconsistencies); ITT Fed. Servs. Int'l Corp., B-289863.4 (Dec. 16, 2002) (same).

MSC's failure to recognize and address this internal inconsistency in Presidential's second final proposal revisions was not reasonable. The internal inconsistency in Presidential's proposal, on its face, should have lead MSC to question whether Presidential would comply with the [redacted], if not conclude that it could not do so. Raloid Corp., B-297176 (Nov. 10, 2005); KIRA, Inc., B-287573.4, B-287573.5 (Aug. 29, 2001).[7] In light of this unresolved issue, and that relating to the absence of any adequate evidence of [redacted], it was not reasonable for MSC to increase Presidential's Personnel Plan technical evaluation between its first and second final proposal revisions from "[redacted]" to "[redacted]." Compare AR 451 with AR 475.

E. Geo-Seis Was Actually Prejudiced.

As to MSC's improper acceptance of Presidential's late filed first and second final proposal revisions, waiving the deadline for Presidential alone effectively conferred a competitive advantage on Presidential because other proposers were required to meet the constraints of the earlier deadlines. Zebra Tech. Int'l, LLC, B-296158 (June 24, 2005).

[7] While it is true that the Solicitation authorized the substitution of personnel, AR 202, it would be incorrect to suggest that a wholesale substitution of Presidential's workforce to cure the [redacted] would have been acceptable. Such conduct would clearly have run afoul of the well established "bait and switch" prohibitions. See, e.g., ACS Gov't Servs., Inc., B-293014 (Jan. 20, 2004). Moreover, substitution of personnel provisions are designed to accommodate unforeseen circumstances, S.C. Myers & Assocs., B-286297 (Dec. 20, 2000), and are not a cure for a proposer's failure to comply with solicitation requirements.

Waiver of the deadlines for Presidential thus granted it additional time to prepare its final proposal revisions, rendering the basis of competition unequal among proposers. See GROH GmbH, B-291980 (Mar. 26, 2003).

As to the defects in MSC's best value determination and the defects in its evaluations of Presidential's Personnel Plan and other technical elements, Geo-Seis has made an adequate showing that but for those errors there was a reasonable possibility that it would have been ranked [redacted] than Presidential. In that case, the SSA would have needed to conduct a paired comparison between [redacted] and Geo-Seis. AR 356-58. Given that Geo-Seis offered the [redacted], which MSC has [redacted], AR 357, and that it was evaluated as [redacted] to [redacted] on Past Performance and various technical sub-subfactors, AR 353-54, Geo-Seis certainly would have had a substantial chance of receiving the award under those circumstances.

F. The Court Should Permanently Enjoin MSC from Further Performance of the Contract with Presidential.

1. Geo-Seis Will Suffer Irreparable Harm if a Permanent Injunction Is Not Issued.

When analyzing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993). See also Overstreet Elec. Co., Inc. v. United States, 47 Fed. Cl. 728, 744 (2000); Bean Dredging Corp. v. United States, 22 Fed. Cl. 519, 524 (1991) (stating that absent injunctive relief, "plaintiffs could recover only bid preparation costs, not lost profits, through an action at law").

Here, absent injunctive relief, Geo-Seis will lose the opportunity to earn the profit it would have made under this contract. Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field, has been found sufficient to constitute irreparable harm. Hosp. Klean, 65 Fed. Cl. at 624; United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 333 (2003); MVM, Inc. v. United States, 46 Fed. Cl. 137, 143 (2000).

2. The Balance of Hardships Strongly Favors Geo-Seis Because There Will Be No Meaningful Harm to MSC Since it Is Presently Resupplying Naval Vessels Using Available Military Assets.

Issuance of a permanent injunction will result in no meaningful harm to the United States because it has several different options for replenishment of vessels in the Pacific. At the outset, it is important to note that the services being procured through the Solicitation have previously been performed strictly with military assets. The Solicitation in MSC's first venture at privatizing this function.

Replenishment at sea can take the form of either vertical replenishment, using helicopters, or conventional replenishment, using pulley lines between ships. Docket No. 9 (Affidavit of Ronald Black), ¶ 3. Although vertical replenishment is the preferred method of moving cargo between ships, conventional replenishment is still a common practice. Id. The Navy has approximately 1,300 rotor wing aircraft in its inventory, nearly all of which capable of external load missions. Id. Navy vessels also have the option of replenishment ashore, which can be accomplished at any port facility. Id. The bottom line is that a brief delay in the deployment of the two Presidential helicopters

which would constitute Alpha Detachment will not disrupt the mission of the Pacific Fleet.

3. It Will Be in the Public Interest to Grant the Permanent Injunction Geo-Seis Has Requested.

There is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations. Hosp. Klean, 65 Fed. Cl. at 624; Gentex Corp. v. United States, 58 Fed. Cl. 634, 648 (2003); Cincom Sys. v. United States, 37 Fed. Cl. 266, 269 (1997) (citing Magellan Corp, 27 Fed. Cl. at 448). Enforcement of FAR 52.215-1 will clearly advance that public interest.

## IV. CONCLUSION

For the foregoing reasons, Geo-Seis respectfully submits that its Motion for Judgment on the Administrative Record should be granted and MSC should be permanently enjoined from any further performance of the contract it entered into with Presidential pursuant to the Solicitation.

Dated this 27th day of April, 2007.

Davis Wright Tremaine LLP
Attorneys for Plaintiff
Geo-Seis Helicopters, Inc.

By: /s/ Robert K. Stewart, Jr.
Robert K. Stewart, Jr.
701 W 8th Avenue, Suite 800
Anchorage, Alaska 99501
Phone: (907) 257-5300
Fax: (907) 257-5399
bobstewart@dwt.com
Alaska Bar No. 8506082

## CERTIFICATE OF FILING

I hereby certify that on April 27, 2007, a copy of the foregoing Memorandum in Support of Motion for Judgment on the Administrative Record was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Robert K. Stewart, Jr.