# In the United States Court of Federal Claims

No. 07-155C

(Filed Under Seal: July 13, 2007)
(Reissued: July 30, 2007)

_____
)
**GEO-SEIS HELICOPTERS, INC.,**    )     Post-award bid protest; Military
    )     Sealift Command; solicitation
    Plaintiff,    )     for vertical replenishment
    )     services; cross-motions for
    v.    )     judgment on the administrative
    )     record; Federal Acquisition
**UNITED STATES,**    )     Regulation's "late is late" rule;
    )     FAR § 15.208(b)(1);
    Defendant, and    )     FAR § 52.215-1(c)(3)(ii)(A);
    )     amendments to solicitation;
**PRESIDENTIAL AIRWAYS, INC.,**    )     FAR § 15.206; injunctive relief
    )
    Intervening Defendant.    )
_____)

Robert K. Stewart, Jr., Davis Wright Tremaine LLP, Anchorage, AK, for plaintiff.

Brian S. Smith, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Mark Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

David Hammond, Crowell & Moring, LLP, Washington, D.C., for intervening defendant. With him on the briefs were John E. McCarthy, Jr. and Adelicia Cliffe Taylor, Crowell & Moring, LLP, Washington, D.C.

# OPINION AND ORDER[1]

LETTOW, Judge.

This post-award bid protest involves a solicitation issued by the Military Sealift Command for the provision of three helicopter detachments to provide vertical replenishment ("VERTREP") services in support of the U.S. Navy's 5th and 7th Fleets operating in the Pacific and Indian Oceans and adjacent areas. Plaintiff Geo-Seis Helicopters, Inc. ("Geo-Seis") challenges the Sealift Command's award of a contract for this work to intervenor Presidential Airways, Inc. ("Presidential") on various grounds, including that the Command's Contracting Officer violated the "late is late" rule in the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 52.215-1(c)(3)(ii)(A),[2] by improperly accepting Presidential's untimely submissions of its final proposed revisions to its offer. Geo-Seis requests that this court permanently enjoin the Military Sealift Command from further performance of the resulting contract.

Geo-Seis filed its complaint on March 9, 2007, and Presidential filed a motion to intervene on March 12, 2007, which motion the court granted via an order issued the next day, on March 13, 2007. On March 14, 2007, Geo-Seis filed a motion for a temporary restraining order, and the court held a hearing on that motion on March 16, 2007, denying Geo-Seis's application for such an order without prejudice to the consideration of injunctive relief on the merits. On March 15, 2007, Presidential filed a motion to dismiss Geo-Seis's small business claims under RCFC 12(b)(6) for failure to state a claim upon which relief could be granted.[3]

---

[1] Because this opinion and order might have contained "confidential or proprietary information" within the meaning of the Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4, it was initially filed under seal. The parties were requested to submit proposed redactions on or before July 20, 2007. After receipt and consideration of these proposals, the decision was prepared for publication. The resulting redactions are shown by brackets enclosing asterisks as follows: "[***]".

[2] FAR § 52.215-1(c)(3)(ii)(A) provides in part that "[a]ny proposal, modification, or revision received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless [specifically stated exceptions apply]." The full text of this provision is set out in the Addendum to this decision, *infra*.

[3] On March 15, 2007, Presidential also filed a motion for a protective order related to competition-sensitive documents and information. On March 19, 2007, the court granted that motion and issued a protective order for this case.

On March 30, 2007, the government filed the administrative record.[4]  On April 12, 2007, in accord with 28 U.S.C. § 1491(b)(3), the court adopted an expedited schedule for filing cross-motions for judgment on the administrative record and for a hearing on those motions.[5]  Thereafter, on May 30, 2007, the court heard argument on the cross-motions and held a trial to take testimony concerning factual issues associated with equitable relief.  The case is now ready for disposition.

**FACTS**

On May 20, 2005, the Military Sealift Command[6] issued Solicitation N00033-05-R-1004

---

[4]"AR __ " refers to the administrative record filed with the court in accord with RCFC 52.1(a).

On May 30, 2007 and June 11, 2007, Geo-Seis and Presidential, respectively, each filed a motion seeking to supplement the administrative record.  Geo-Seis's motion sought to supplement the record with an e-mail to potential bidders from an official with the Sealift Command, Pl.'s Mot. to Suppl. the Record at 1, while Presidential's motion sought to insert in the record a second declaration of Presidential's chief financial officer.  Intervenor's Mot. to Suppl. the Record at 1.  In an order dated June 14, 2007, the court granted both motions.  Geo-Seis's motion was granted because the pertinent e-mail ought to have been included in the administrative record originally compiled by the government.  Presidential's motion was granted not because the second declaration properly comprised part of the administrative record (it was not before the Military Sealift Command during consideration of the proposals responding to the solicitation) but rather because it related to an issue (the propriety of injunctive relief) respecting which the pertinent evidentiary record is developed before the court, not the agency.  *See* RCFC 52.1, Rules Committee Note, 2006 Adoption ("Cases filed in this court frequently turn only in part on action taken by an administrative agency.  In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings.").  *See also PGBA, LLC v. United States*, 60 Fed. Cl. 567 (2004) (analyzing results of evidentiary hearing on equitable issues), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).  In this instance, the second declaration proffered by Presidential supplemented testimony adduced at the trial of issues concerning injunctive relief held on May 30, 2007.

[5]The Tucker Act, which sets out this court's bid-protest jurisdiction, provides that "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."  28 U.S.C. § 1491(b)(3).

[6]The Military Sealift Command is one of three "component commands" subordinate to the U.S. Transportation Command.  *See* Military Sealift Command, Overview, Command Relationships, http://www.msc.navy.mil/N00P/overview.asp?page=cr (last visited July 10, 2007)*.*  The Sealift Command's mission "is to provide ocean transportation of equipment, fuel, supplies and ammunition to sustain U.S. forces worldwide during peacetime and in war for as

for the procurement of three two-helicopter detachments to provide ship- and shore-based VERTREP services in support of the U.S. Navy's 5th and 7th Fleets. AR 179, 189-90, 194 (Solicitation, Standard Form 33, §§ C 2.2, C 2.2.2, C 3.2.2).[7]  In addition to the VERTREP services, which include moving ammunition and other cargo, each detachment was required to conduct various other missions, including search and rescue operations and medical evacuation transfers. AR 190 (Solicitation § C 2.4).  Under the solicitation, the Military Sealift Command would award a firm, fixed-price contract for a six-to-twelve month pre-deployment period, with additional one-year options for deployment of up to three detachments, designated ALPHA, BRAVO, and CHARLIE. AR 219-20 (Solicitation §§ F 1.1-1.2).[8]  Beginning with ALPHA detachment, one detachment would deploy each year for three consecutive years beginning in October 2006. AR 189 (Solicitation § C 2.2.1), 345-46 (Solicitation Amendment 11 (Aug. 11, 2006)) (postponing deployment dates).

The Military Sealift Command was to evaluate the offers based on three evaluation factors, in descending order of importance: technical quality, price to the government, and past performance. AR 259 (Solicitation §§ M 2.1, 2.1.1), 330-31 (Solicitation Amendment 5 (Oct. 27, 2005)).[9]  Non-price factors, when combined, were to be given greater weight than price, and

---

long as operational requirements dictate."  Military Sealift Command, Overview, Mission, http://www.msc.navy.mil/N00P/overview.asp?page=mission (last visited July 10, 2007).

[7]The U.S. Navy's 5th Fleet supports all naval operations in the U.S. Central Command's area of responsibility.  Commander, U.S. Naval Forces Central Command, http://www.cusnc. navy.mil/command/index.html (last visited July 10, 2007).  The U.S. Navy's 7th Fleet's area of responsibility encompasses much of the Indian and Pacific Oceans.  United States Navy, Seventh Fleet, The Region, http://www.c7f.navy.mil/Pages/region.html (last visited July 10, 2007).

[8]The six-to-twelve month fixed period involved pre-delivery inspection for ALPHA detachment, and, upon successful completion of that inspection, a 30-to-90-day firm pre-deployment testing period.  The contract then provided for five 12-month deployment options for ALPHA detachment and for four 12-month deployment options for each of the other two detachments, BRAVO and CHARLIE.  The term of the contract was not to exceed six years.  AR 219-20 (Solicitation §§ F 1.1-1.3).

[9]The original solicitation included a fourth evaluation criterion, "Socio-Economic Considerations ([f]or large business offerors)," but that criterion was eliminated by Amendment 5 to the solicitation.  AR 259 (Solicitation § M 2.1), 330-31 (Solicitation Amendment 5 (Oct. 27, 2005)).  Amendment 5 converted the solicitation to a small-business set-aside in accord with the original solicitation, which mandated the conversion if the Sealift Command received two or more offers from qualified small business concerns.  AR 251 (Solicitation § L), 330-31 (Solicitation Amendment 5 (Oct. 27, 2005)).  Having received five proposals from small business concerns, the Sealift Command converted the solicitation to a small-business set-aside.  AR 330-31 (Solicitation Amendment 5 (Oct. 27, 2005)), 251 (Solicitation § L), 351 (Source Selection

the importance of price was to increase with the degree of equality of the proposals or if a proposal's price was so significantly high as to diminish the value of its technical superiority. AR 259 (Solicitation § M 2.1.1).

On July 14, 2005, the Sealift Command received six timely offers, including proposals from Geo-Seis and Presidential, but the Command deemed all five offers[10] it evaluated to be unsatisfactory.  AR 380-81 (Pre-negotiation Business Clearance Mem.).[11]  After two rounds of discussions with the offerors, the Command issued Amendment 8 to the solicitation, closing discussions and establishing March 22, 2006, at 2:00 p.m. as the date and time for receipt of final proposal revisions.  AR 5-8 (Contracting Officer's Statement of Facts, GAO Case No. B-299175), 338-39 (Solicitation Amendment 8 (Mar. 14, 2006)).[12]

The Sealift Command received timely revised submissions from four of the five offerors, but Presidential's revision did not arrive until March 22, 2006, at 2:30 p.m., which was one-half hour late.  *See* AR 342 (Mem. to File from Cathlene Jo Stangler, Contracting Officer, and Brian Kimm, Contract Specialist, Military Sealift Command (Mar. 22, 2006)).[13]  Prompted by an e-mail sent by Presidential at 12:36 p.m. on March 22, 2006 indicating that its revised proposal might arrive late due to weather delays, the Sealift Command's Contracting Officer decided – prior to the 2:00 p.m. closing time – to extend the closing date and time by amending the solicitation.  AR 3125-26 (Second Declaration of Stangler (Jan. 24, 2007)), 3127 (E-mail from Tim Childrey, Presidential, to Stangler (Mar. 22, 2006)).  However, the Contracting Officer did not issue Amendment 9, which extended the closing date and time of the solicitation to March 23, 2006, at 11:00 a.m., until March 22, 2006, at 2:36 p.m.  AR 340-41 (Solicitation Amendment 9 (Mar. 22, 2006)), 3132 (E-mail from Kimm to offerors (Mar. 22, 2006)).  In a memorandum to file dated March 22, 2006 the Contracting Officer explained that the Sealift Command had determined that it was "in the best interest of the Government" to issue Amendment 9 "in order

---

Decision).

[10]The Military Sealift Command did not evaluate the proposal of Evergreen Helicopters of Alaska ("Evergreen"), one of the six offerors.  Following the conversion of the solicitation to a small-business set-aside, Evergreen, a large business, was not eligible for an award.  AR 351 (Source Selection Decision Document).

[11]Amendment 2 to the solicitation extended the closing date for bids from July 11, 2005 to July 14, 2005.  AR 312-13 (Solicitation Amendment 2 (June 30, 2005)).

[12]The closing time was to be "Washington[,] DC Time," *i.e.,* Eastern Standard Time.  AR 339 (Solicitation Amendment 8 (Mar. 14, 2006)).

[13]Federal Express tracking data indicate that Presidential's revised proposal was delivered at 2:33 p.m. on March 22, 2006.  AR 3131 (Federal Express, Track Shipments (printed on Jan. 23, 2007)).

to obtain maximum competition for this unique requirement." AR 342 (Mem. to File from Stangler and Kimm (Mar. 22, 2006)).

From April to July of 2006, the Military Sealift Command conducted three technical evaluations of the proposed revisions, and in May 2006, it reopened discussions with all offerors. AR 8-9 (Contracting Officer's Statement of Facts, GAO Case No. B-299175), 435 (Final Proposed Revision Technical Evaluation Report).  On August 4, 2006, the Command issued Amendment 10, which announced that discussions would close August 10, 2006 and that the date and time for receipt of a second round of revised proposals would be August 15, 2006, at 2:00 p.m.  AR 9 (Contracting Officer's Statement of Facts, GAO Case No. B-299175), 343-44 (Solicitation Amendment 10 (Aug. 4, 2006)).[14]

The Sealift Command received timely submissions of the second round of revised proposals from three of the remaining four bidders – Geo-Seis, [***], and [***][15] – but Presidential's revised proposal again arrived late, at 2:30 p.m. on August 15, 2006.  AR 488 (Pre-negotiation Business Clearance Mem.).[16]  As before, shortly prior to the deadline, Presidential gave notice that weather problems might delay the arrival of its submission, and the Sealift Command again decided to extend the closing time for the solicitation.  AR 488 (Pre-negotiation Business Clearance Mem.), 3125-26 (Second Declaration of Stangler (Jan. 24, 2007)), 3866 (E-mail from Childrey to Stangler (Aug. 15, 2006)).  On August 15, 2006, at 3:29 p.m. and 3:31 p.m., the Contracting Officer e-mailed Amendment 12 of the solicitation to Geo-Seis and Presidential, respectively.  AR 3137 (E-mail from Stangler to Ron Black and William T. Browder (Aug. 15, 2006)), 3867 (E-mail from Childrey to Stangler (Aug. 15, 2006)) (confirming receipt of Stangler's e-mail sent at 3:31 p.m.); see AR 347 (Solicitation Amendment 12 (Aug. 15, 2006)).  Amendment 12 extended the closing time until 4:00 p.m. on August 15, 2006.  A memorandum to the file prepared on that same day stated that the amendment "was issued in order to allow for the maximum competition among all offerors who remain in the competitive range" and that "issuing th[e] amendment [wa]s in the best interest of the Government."  AR 349 (Mem. to File from Stangler and David Little, Contract Specialist (Aug. 15, 2006)), 347 (Solicitation Amendment 12 (Aug. 15, 2006)); see also AR 488 (Pre-negotiation Business Clearance Mem.).

---

[14]The closing time was "Washington[,] DC Time," i.e., Eastern Daylight Time.  AR 344 (Solicitation Amendment 10 (Aug. 4, 2006)).

[15]Of the five offerors, one, [***], withdrew its proposal on August 4, 2006, leaving only four bidders.  See AR 488 (Pre-negotiation Business Clearance Mem.).

[16]Federal Express tracking data indicate that Presidential's second revised proposal was delivered at 2:17 p.m. on August 15, 2006.  AR 3135 (Federal Express, Track Shipments (printed on Jan. 23, 2007)).

Upon reviewing the second revised proposals of the four bidders, the Source Selection Authority ("SSA") determined that Presidential represented the best value to the government. AR 351-58 (Source Selection Decision Document).[17]   On October 7, 2006, Geo-Seis challenged the small business status of Presidential, but the Small Business Administration ("SBA") rejected that protest on November 2, 2006.  AR 3346-50 (Letter from Browder to Stangler (Oct. 7, 2006)), 3646-51 (Facsimile from Mitchell Morand, Area Director, SBA (Nov. 2, 2006)).  On November 2, 2006, the Sealift Command awarded Contract No. N00033-07-C-1004 to Presidential.  AR 581 (Contract No. N00033-07-C-1004 (Nov. 2, 2006)).

On November 27, 2006, Geo-Seis filed a bid protest with the Government Accountability Office ("GAO"), supplementing that protest on January 16, 2007.  AR 93-137 (Facsimile from Robert K. Stewart, Counsel, Geo-Seis to GAO, Office of the General Counsel (Nov. 27, 2006)), 2829-64 (Letter from Stewart to Mary Curcio, GAO, Office of the General Counsel (Jan. 16, 2007)).  Geo-Seis argued that (1) the Sealift Command violated the FAR's "late is late" rule by accepting Presidential's first and second revised proposals, (2) the Command failed to consider that Presidential had not complied with the Command's request that Presidential's proposal include documentation that the offeror had discussed "[***]" with the key personnel identified in its bid, and (3) the Command's best-value determination was unreasonable.  AR 2831, 2837-38, 2842 (Letter from Stewart to Curcio (Jan. 16, 2007)).  GAO denied the protest on March 5, 2007, finding no merit in any of the arguments put forth by Geo-Seis.  AR 3316-17 (*Matter of Geo-Seis Helicopters, Inc.*, Nos. B-299175, B-299175.2 (G.A.O. Mar. 5, 2007)).  Geo-Seis filed its complaint in this court on March 9, 2007.

## STANDARDS FOR DECISION

This court's review of a federal agency's decision regarding a contractual solicitation or award is governed by provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4).  The relevant standard calls upon the court to evaluate whether an agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The court's review is limited to determining whether the agency's "decision was based on a consideration of the relevant factors and whether there has

---

[17][***] submitted the lowest priced offer, but its proposal was technically inferior to that of the other three offerors, Presidential, Geo-Seis, and [***].  AR 355 (Source Selection Decision).  Given this circumstance, the SSA first undertook to determine (1) which of the three technically superior bids offered the best value and then (2) whether that bid's technical superiority over [***]'s bid warranted the higher price.  AR 355-58.  The SSA determined that the proposals of Geo-Seis and [***] were "essentially technically equal" to Presidential's proposal, and Geo-Seis and [***] received higher Past Performance ratings than [***].  AR 355. Nonetheless, the SSA concluded that Geo-Seis's and [***]'s higher Past Performance ratings did not justify bid prices that were [***] and [***] higher, respectively, than Presidential's bid price. *Id.*  The SSA then compared Presidential to [***], concluding that Presidential's technically superior bid was worth the additional [***] over the price of [***]'s offer.  AR 358.

been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction). In conducting a review under these standards, the court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Beyond a showing that the agency acted without a rational basis or contrary to law, the disappointed bidder, to prevail in a bid protest, must show that the government's actions actually prejudiced the bidder in the procurement process. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). In short, the protestor "must show that there was a 'substantial chance it would have received the contract award but for that error.'" *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

If a protestor succeeds in making these showings, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). The decision whether injunctive relief should issue is governed by traditional factors, *viz*., "(1) whether . . . the plaintiff [protestor] has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).

## ANALYSIS

### A. The "Late is Late" Rule under FAR § 52.215-1(c)(3)(ii)(A)

Geo-Seis makes three broad arguments in support of its motion for judgment on the administrative record, but only its argument as to the application of the FAR's "late is late" rule warrants a detailed discussion.[18] Geo-Seis argues that the Sealift Command contravened the

---

[18]The two other arguments that Geo-Seis advances are without merit. First, Geo-Seis asserts that the Sealift Command failed to consider Presidential's alleged failure to comply with the Command's request that Presidential's proposal include "[***]." Pl.'s Cross-Mot. at 27-31; *see* AR 1127 (Attachment to e-mail from Stangler to Childrey (May 3, 2006)). This argument fails because (1) the Command's request was a discussion item e-mailed to Presidential by the

FAR's "late is late" rule under § 52.215-1(c)(3)(ii)(A) by accepting Presidential's untimely submissions of its first and second revised proposals and that the Sealift Command had no authority to extend the deadlines for those submissions by issuing Amendments 9 and 12 to the solicitation.  Pl.'s Cross-Mot. at 9, 11-12.[19]  Geo-Seis contends that the Command should have rejected Presidential's first and second revised proposals and should have evaluated Presidential, if at all, solely on the basis of its initial proposal of July 14, 2005.  *Id.* at 11-12.  The government and Presidential assert that the "late is late" rule in FAR § 52.215-1(c)(3)(ii)(A) does not preclude an agency from changing the closing time *nunc pro tunc* for submission of revised proposals and that the "late is late" rule operates only respecting offerors and does not bind government agencies.  Def.'s Cross-Mot. at 13, 16-17; Intervenor's Mot. at 9, 14-16.

---

Contracting Officer, not a requirement under the Solicitation, and (2) Presidential adequately responded to the Contracting Officer's request.  AR 254 (Solicitation § L 6.3.2), 1311-19 (E-mail and attachments from Childrey to Stangler (May 11, 2006)); *see also* AR 3112 (Letter from Robert M. Ewell, Assoc. Counsel, and Michelle L. Salter, Assistant Counsel, Dep't of the Navy, to Curcio, GAO Case Nos. B-299175; B-299175.2 (Jan. 24, 2007)) (Contracting Officer did not convey to Presidential that she required additional evidence on this point).

Second, Geo-Seis argues that the Sealift Command's "best value" determination was unreasonable because the SSA's trade-off analysis was conclusory and lacked "reasoned analysis."  Pl.'s Cross-Mot. at 19.  In essence, the basis for this argument by Geo-Seis is that the SSA did not properly weigh the evaluation factors in arriving at its decision.  *Id.* at 19-20.  However, the Source Selection Decision provides sufficient evidence that the SSA weighed the three factors – technical quality, price to the government, and past performance – in evaluating all four offerors.  *See* AR 351-58 (Source Selection Decision).  Moreover, particularly when evaluating an agency's decision in a "best value" solicitation such as this, AR 259 (Solicitation § M 1.1), this court will not second-guess the discretionary judgments the SSA made in balancing these factors.  *See Galen Med. Assocs.,* 369 F.3d at 1330 ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone."); *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir. 1996) ("[The protestor's arguments] deal with the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials that a court will not second guess."); *RISC Mgmt. Joint Venture v. United States,* 69 Fed. Cl. 624, 638 (2006) ("[A]lthough the court would have undertaken a different analytical approach had it been in the shoes of the Contracting Officer, it cannot conclude that the Contracting Officer made an unsupported best-value determination.").

[19]The solicitation incorporated by reference the "late is late" rule set out in FAR § 52.215-1.  AR 251 (Solicitation § L 1.0).

In full, FAR § 52.215-1(c)(3)(ii)(A) states that:

Any proposal, modification, or revision received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and –

> (1) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or
> (2) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or
> (3) It is the only proposal received.

FAR § 52.215-1(c)(3)(ii)(A).[20]

This court must construe a regulation "in the same manner as [it] construe[s] a statute, by ascertaining its plain meaning." *Lengerich v. Department of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006). "To interpret a regulation we must look at its plain language and consider the terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997). As with a statute, this court presumes that an agency or other regulatory body says in a regulation what it means and means in a regulation what its says. *Cf. Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what is says there.").

FAR § 52.215-1(c)(3)(ii)(A) provides in mandatory language that any proposal, modification, or revision received "after the exact time specified for receipt of offers is '*late*'" and that such proposals "*will not* be considered" unless one of the three criteria specified in the

---

[20]FAR § 52.215-1(c)(3)(ii)(A) is nearly identical to FAR § 15.208(b)(1). FAR § 15.208, entitled "Submission, modification, revision, and withdrawal of proposals" is found in Subpart 15.2, "Solicitation and Receipt of Proposals and Information." FAR § 52.215-1, entitled "Instructions to Offerors – Competitive Acquisition," is found in Subpart 52.2, "Text of Provisions and Clauses." *See* FAR §§ 15.208, 52.215-1. Courts have applied both provisions in determining whether the exceptions stated in those rules were applicable to the facts of the case, thereby permitting an agency to accept a bidder's late proposal. *Compare Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 173 (2005) (analyzing FAR § 15.208(b)(1)), *with Conscoop-Consorzia Fra Coop. Di Prod. E Lavoro v. United States*, 62 Fed. Cl. 219, 239 (2004) (analyzing FAR § 52.215-1(c)(3)(ii)(A)).

The text of both provisions is set out in the Addendum to this decision, *infra*.

provision is met.  FAR § 52.215-1(c)(3)(ii)(A) (emphasis added).  Courts interpreting the "late is late" rule have adhered to the plain text of the regulation, commenting that its requirement that offerors submit their proposals on time is a "strict rule with very limited exceptions." *Argencord*, 68 Fed. Cl. at 173 (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Gov't Contracts* 786 (3d ed. 1998)); *accord Conscoop-Consorzia*, 62 Fed. Cl. at 236 (same, ruling that an agency properly rejected a proposal as untimely because it did not fall within any of the enumerated FAR exceptions); *see also Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 621-24 (2005) (granting a temporary restraining order where there was a likelihood that an agency had awarded a contract to an offeror whose late delivery of its proposal was the fault of Federal Express, not the government).  The limited exceptions are expressly set out in the regulations.  *See* FAR § 52.215-1(c)(3)(ii)(A)(1)-(3); *Conscoop-Consorzia*, 62 Fed. Cl. at 238 ("[T]he Navy was required to reject [plaintiff's] price proposal as untimely, unless one of the exceptions for acceptance of late proposals listed in FAR 52.215-1(c)(3) applie[d]."); *see also Argencord*, 68 Fed. Cl. at 173 (analyzing analogous provisions in FAR § 15.208(b)(1)(i)-(iii)).

Similarly, the GAO has held that a late proposal may only be accepted if one of the exceptions contained in FAR § 52.215-1(c)(3)(ii)(A)(1)-(3) is applicable.  *See Symetrics Indus., LLC*, No. B-298759, 2006 WL 2946848, at *2 (G.A.O. Oct. 16, 2006) ("a late proposal revision . . . may only be accepted if one of the exceptions contained in FAR [§] 52.215-1(c)(3) is applicable."); *cf. Integrated Bus. Solutions, Inc.*, No. B-292239, 2003 WL 21659403, at *2 (G.A.O. July 9, 2003) ("Proposals received after the exact time specified for receipt of proposals are late and will not be considered by the government unless the exceptions outlined in FAR § 15.208(b)(1) apply.").

Presidential's first and second revised proposals were "late" because they were received after the "exact time" specified for receipt of those proposals.  *See* FAR § 52.215-1(c)(3)(ii)(A). The first revised proposals were due March 22, 2006, at 2:00 p.m., AR 338-39 (Solicitation Amendment 8 (Mar. 14, 2006)), but Presidential's revision did not arrive until 2:30 p.m.  AR 342 (Mem. to File from Stangler and Kimm (Mar. 22, 2006)).  The second set of revised proposals was due August 15, 2006, at 2:00 p.m, AR 343-44 (Solicitation Amendment 10 (Aug. 4, 2006)), but Presidential's second revision did not arrive until 2:30 p.m.  AR 488 (Pre-negotiation Business Clearance Mem.).  The plain language of the regulation and the government's concession that none of the criteria set forth in FAR § 52.215-1(c)(3)(ii)(A)(1)-(3) were satisfied in this case, Def.'s Cross-Mot. at 12, would seem to be conclusive, rendering the Military Sealift Command's acceptance of Presidential's revised proposals a violation of FAR § 52.215-1(c)(3)(ii)(A).  The government and Presidential resist this conclusion, however, insisting that the Sealift Command's actions were proper because Presidential's revised proposals were timely given the *nunc pro tunc* effect of Amendments 9 and 12, which extended the deadlines for submission of the first and second revisions, respectively.  *See* Def.'s Cross-Mot. at 13-14; Intervenor's Mot. at 9; AR 340-41 (Solicitation Amendment 9 (Mar. 22, 2006)), 347 (Solicitation Amendment 12 (Aug. 15, 2006)).

11

## B. Effect of *Post-hoc* Amendments to the Solicitation on the "Late is Late" Rule

In support of their view that Amendments 9 and 12 justified the Sealift Command's acceptance of Presidential's revised proposals, the government and Presidential rely principally on a set of GAO precedents that permit the issuance of post-expiration amendments to a solicitation extending the closing dates. *See Matter of Ivey Mech. Co.*, No. B-272764, 1996 WL 478103, at *1 (G.A.O. Aug. 23, 1996) ("[W]e have repeatedly approved of the issuance of amendments extending closing dates after the expiration of the original closing date when the result is enhanced competition."); *Matter of Varicon Int'l, Inc.*; No. B-255808, 1994 WL 125250, at *3 (G.A.O. Apr. 6, 1994) ("the [FAR] does not prohibit the issuance of amendments extending the closing date for proposals after that date has passed."); *Matter of Fort Biscuit Co.*, 71 Comp. Gen. 392, 394 (G.A.O. May 12, 1992) ("[W]e have held that issuance of an amendment extending the time for bid opening even after the deadline has passed is proper where its intent is to enhance competition by permitting an offeror sufficient time to prepare an offer."); *Matter of Institute for Advanced Safety Studies*, No. B-221330, 1986 WL 63783, at *2 (G.A.O. July 25, 1986) ("While [the FAR] . . . contemplates the issuance of solicitation amendments prior to the closing date, it does not specifically prohibit the issuance of amendments extending the closing date after the closing date.").[21]

The government and Presidential cite Professor Ralph Nash's criticism of the "late is late" rule emphasizing his opinion that the rule is contrary to the government's interest in enhancing competition. Def.'s Cross-Mot. at 15-16 n.3; Intervenor's Reply at 5-6. They refer to Professor Nash's comment that the FAR's "'late-is-late' rule" is "dumb" and that a way to circumvent the rule, consistent with GAO precedent, is to issue a *post-hoc* amendment to the solicitation extending the deadline for submission. Ralph C. Nash & John Cibinic, *Dateline: January 2007*, Nash & Cibinic Report, Vol. 21, No. 1 (2007) (citing *Ivey Mech.*, 1996 WL 478103). Geo-Seis challenges the application of these precedents and arguments on the grounds

---

[21]Presidential also argues that the titles of FAR § 52.215-1, "Instructions to Offerors - Competitive Acquisition," and Section L of the solicitation, "Instructions, Conditions and Notices to Bidders," demonstrate that § 52.215-1 is not directed at government agencies and thus cannot limit the Sealift Command's discretion to issue *post-hoc* amendments extending the deadline for submission of revised proposals. *See* Intervenor's Mot. at 9-10. On this point, as Geo-Seis points out, Pl.'s Resp. at 2, Presidential's position runs counter to a longstanding rule of statutory construction that equally applies to the interpretation of regulations – *viz.*, that headings and titles are not controlling. *See Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528-29 (1947) ("[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase[,] . . . [b]ut they cannot undo or limit that which the text makes plain.") (citations omitted); *Metcalf Const. Co., Inc. v. United States*, 53 Fed. Cl. 617, 629 (2002) (quoting *Brotherhood of R. R. Trainmen*). Because there is no ambiguity in the language of FAR § 52.215-1(c)(3)(ii)(A) that once a proposal is late it "will not be considered," the section heading and caption cannot inform this court's interpretation of that regulation.

that they contravene the text of the FAR provisions and are negated by the regulatory history of pertinent amendments to the FAR.

### 1. Regulatory history of FAR § 52.215-1(c)(3)(ii)(A).

Specifically, Geo-Seis argues that the regulatory history of proposed changes to the "late is late" rule that were rejected in 1997 refutes the government's argument that Amendments 9 and 12, in effect, trumped the "late is late" rule.  Pl.'s Cross-Mot. at 18-19; Pl.'s Resp. at 6-9.

As part of a larger effort to revise the FAR's Part 15, Contracting by Negotiation, the FAR Council issued proposed rules that would have amended the "late is late" rule.  Federal Acquisition Regulation; Part 15 Rewrite—Phase I, 61 Fed. Reg. 48,380, 48,380-81 (Sept. 12, 1996).  The FAR Council explained that the proposed rule changes involved "[m]ajor policy shifts," including "[r]evision of the rules governing late proposals for negotiated acquisitions to make the offeror responsible for timely delivery of its offer, and to allow late offers to be considered if doing so is in the best interests of the Government."  *Id.* at 48,380-81.  As proposed, the "late is late" rule would have stated in relevant part: "Offers, and requested revisions to them, that are received in the designated office after the time for receipt are 'late' *and shall be considered at the Source Selection Authority's discretion*."  *Id.* at 48,392 (emphasis added).  Moreover, the analogous provision in the proposed FAR § 15.207(b) would have provided: "Proposals, modifications, and revisions received in the designated Government office after the exact time specified are 'late' *but may be considered if doing so is in the best interests of the government*."  61 Fed. Reg. at 48,386 (emphasis added).

On September 30, 1997, the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council ("the Councils") issued a final rule revising FAR Part 15.  *See* Federal Acquisition Regulation; Part 15 Rewrite; Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. 51,224 (Sept. 30, 1997).  Both proposals for modifying the "late is late" rule – proposed FAR § 52.215-1(c)(3) and proposed FAR § 15.207(b) – were rejected in the final version of the FAR revisions.  *Id.* at § 51,235, § 51,259.[22]  The Councils explained that the final rule reflected a decision to "[r]eestablish . . . the 'late is late' rule for receipt of proposals, responses to requests for information, and modifications."  *Id.* at 51,224.  In rejecting the proposed rules, which would have given government agencies broad discretion to consider late proposals and revisions, the Councils essentially reverted to the language of the former FAR §§ 15.412(c), 52.215-10 by repromulgating the "late is late" rules in FAR §§ 15.208(b)(1), 52.215-1(c)(3)(ii)(A).  *Compare* FAR §§ 15.412(c), 52.215-10 (1997), *with* 62 Fed. Reg. at 51,235, 51,259.[23]  With only minor amendments, *see, e.g.,* Federal Acquisition

_____

[22]In the final rule, the "late is late" provision for Part 15 was included in FAR § 15.208(b)(1), as contrasted to proposed § 15.207(b).  62 Fed. Reg. at 51,235.

[23]The revision did not become effective until October 10, 1997, and agencies were permitted to "delay implementation of the final rule" promulgating those changes until January 1,

Regulation; Conforming Late Offer Treatment, 64 Fed. Reg. 51,837, 51,841 (Sept. 24, 1999), the version of FAR 52.215-1(c)(3)(ii)(A) currently in force reflects the final rule adopted in September 1997. *Compare* FAR § 52.215-1(c)(3)(ii)(A), *with* 62 Fed. Reg. at 51,259.

In light of this regulatory history, reading FAR § 52.215-1(c)(3)(ii)(A) – by omission – to permit the Military Sealift Command's issuance of Amendments 9 and 12 is unwarranted. As Geo-Seis points out, Pl.'s Reply at 7, a standard rule of statutory construction – and one equally applicable to interpreting regulations – is that a court must not give an enactment a construction that has been specifically considered and rejected. *See Immigration & Naturalization Serv. v. Cardoza-Fonseca,* 480 U.S. 421, 442-443 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.") (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 392-393 (1980) (Stewart, J., dissenting)).

Finally, the government argues that the Military Sealift Command's *post-hoc* issuance of Amendments 9 and 12 was within the contracting officer's discretion. Def.'s Cross-Mot. at 13; Def.'s Reply at 2. But the very rationale cited by the Command's Contracting Officer at the time she issued those amendments – that changing the closing date and time for submission of the first and second revised proposals was "in the best interest of the government," AR 342 (Mem. to File from Stangler and Kimm (Mar. 22, 2006)), 349 (Mem. to File from Stangler and Little (Aug. 15, 2006)) – was considered in the proposed FAR § 15.207(b) and ultimately rejected. *Compare* 61 Fed. Reg. at 48,386, *with* 62 Fed. Reg. at 51,235. Similarly, the Councils rejected the proposed version of § 52.215-1(c)(3)(ii)(A) that stated that late revisions "shall be considered at the Source Selection Authority's discretion." *Compare* 61 Fed. Reg. at 48,392, *with* 62 Fed. Reg. at 51,259. The rejection of the proposed revisions to the "late is late" rule apparently resulted from public comments that those proposals "gave too much discretion to [contracting officers]." Ralph C. Nash & John Cibinic, *The FAR Part 15 Rewrite: A Final Scorecard*, Nash & Cibinic Report, Vol. 11, No. 12, ¶ 63 (1997). Consequently, the Councils reverted to the previous "late is late" rule under the former FAR §§ 15.412(c), 52.215-10, with its stricter rule placing minimal discretion in the hands of the contracting officer. 62 Fed. Reg. at 51,224; Nash & Cibinic, *The FAR Part 15 Rewrite: A Final Scorecard*, ¶ 63. This regulatory history amply demonstrates that the government's and Presidential's argument that agencies may circumvent that "late is late" rule by issuing *post-hoc* amendments to the solicitation to extend the closing date or time is unavailing.

## 2. Changes in the FAR Provisions Governing Amendments to a Solicitation.

In the major revision of FAR Part 15 in 1997, changes were made to the rules governing amendments to solicitations. Geo-Seis argues that those changes render inapplicable the GAO decisions upon which the government and Presidential rely. *See* Pl.'s Cross-Mot. at 15-17. The former FAR § 15.410(a) read:

---

1998. 62 Fed. Reg. at 51,229.

> After issuance of a solicitation, but before the date set for receipt of proposals, it may be necessary to (1) make changes to the solicitation, including, but not limited to, significant changes in quantity, specifications, or delivery schedules, (2) correct defects or ambiguities, or (3) change the closing date for receipt of proposals.

FAR § 15.410(a) (1997).  The current provision governing solicitation amendments, FAR §15.206(c), states that "[a]mendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have *not been eliminated from the competition.*" FAR §15.206(c) (emphasis added).

As Presidential concedes, because the former FAR § 15.410(a)(3) provided that an agency could change the closing date for receipt of proposals "[a]fter issuance of a solicitation, *but before the date set for receipt of proposals,*" FAR § 15.410(a)(3) (1997) (emphasis added), it "envisioned amendments occurring prior to [the] closing date."  Intervenor's Reply at 6.  Geo-Seis claims that the current FAR § 15.206(c) "closed [the] loophole [of former FAR § 15.410(a)] and permits the issuance of amendments after the deadline for proposal submittals has passed only to 'offerors that have not been eliminated from the competition.'"  Pl.'s Cross-Mot. at 16.  Geo-Seis argues that Presidential was an offeror that had "been eliminated from the competition" because FAR § 52.215-1(c)(3)(ii)(A) dictates that once a proposal is late, it "will not be considered"– meaning that at the time the Military Sealift Command issued Amendments 9 and 12, Presidential was no longer in the competition and thus was ineligible for award under FAR § 15.206(c).  Pl.'s Cross-Mot. at 16-17; Pl.'s Resp. at 5.[24]  Presidential responds that FAR

---

[24]GAO apparently has not viewed the changes introduced by FAR § 15.206(c) as bearing in any significant way on interpreting the "late is late" rule.  Although the former FAR amendment provision, § 15.410(a), appeared to contemplate amendments *prior* to the closing date and time, GAO decisions permitted *post-hoc* amendments to the closing date and time.  *See Ivey Mech.*, 1996 WL 478103, at *1 n.2 ("While [FAR] § 15.410 contemplates that solicitation amendments ordinarily will be issued prior to the closing date, it does not prohibit the issuance of amendments extending the closing date after the closing date."); *Fort Biscuit*, 71 Comp. Gen. at 394 ("While [FAR] § 15.410(a) contemplates that solicitation amendments ordinarily will be issued prior to the closing date, it does not prohibit the issuance of amendments extending the closing date after the closing date has passed."); *Institute for Advanced Safety Studies*, 1986 WL 63783, at *2 ("While [FAR] § 15.410(a) . . . contemplates the issuance of solicitation amendments prior to the closing date, it does not specifically prohibit the issuance of amendments extending the closing date after the closing date."). Following the promulgation of FAR §15.206(c), which explicitly contemplated *post-hoc* amendments applicable to offerors that remained in the competition, that interpretation of the "late is late" rule by GAO appears not to have changed. *Compare Matter of Micromass, Inc.*, No. B-278869, 1998 WL 129882, at *4 (G.A.O. Mar. 24, 1998) ("Agencies may extend the closing date for receipt of initial proposals after the expiration of the original closing date to enhance competition.") (citing *Ivey Mech.*, 1996 WL 478103); AR 3320 (*Matter of Geo-Seis Helicopters*, Nos. B-299175, B-299175.2),

§ 15.206(c) does not require a contracting officer to make an affirmative "eligibility" determination when amending the solicitation and that a contracting officer has discretion to extend the deadline for receipt of proposals.  Intervenor's Mot. at 12-13.  Therefore, Presidential asserts, offerors whose revised proposals were submitted prior to the new deadlines established under Amendments 9 and 12 had not been "eliminated from the competition." *Id.*[25]

The meaning of the phrase "offerors that have not been eliminated from the competition," FAR § 15.206(c), has not been addressed by prior precedents nor is it explained by the regulatory history of the provision.[26]  More importantly, the question of whether Presidential was

_____

*with Ivey Mech.*, 1996 WL 478103, at *1 ("[W]e have repeatedly approved of the issuance of amendments extending closing dates after the expiration of the original closing date when the result is enhanced competition."); *see* FAR § 15.206(c) ("[a]mendments issued *after* the established time and date") (emphasis added). In essence, this entire line of GAO decisions – those prior to and after the 1997 revisions – endorses *post-hoc* amendments to the closing date and time despite GAO decisions stating that the only exceptions to the "late is late" rule are those detailed in the rule itself.  *Symetrics Indus., LLC*, 2006 WL 2946848, at *2 (only exceptions are those "contained in FAR [§] 52.215-1(c)(3)"); *Integrated Bus. Solutions, Inc.*, 2003 WL 21659403, at *2 (only exceptions are those "outlined in FAR § 15.208(b)(1)").

[25]Presidential's argument is based in part on a distinction it attempts to draw between language originally proposed for the rule eventually promulgated as FAR § 15.206(c) – "[a]mendments issued after the established time and date for receipt of proposals should be issued *to all offerors still eligible for award*," Federal Acquisition Regulation; Part 15 Rewrite – Phase I, 61 Fed. Reg. 48,380, 48,386 (Sept. 12, 1996) (proposed as FAR § 15.205(c)(1)) (emphasis added) – and the language of FAR § 15.206(c) that was finally adopted indicating that such amendments "shall be issued to *all offerors that have not been eliminated from the competition*."  62 Fed. Reg. at 51,235 (emphasis added). The differences appear to be merely semantic, and the court finds no meaningful distinction between these two versions.
  In a separate argument, Presidential avers that another provision, FAR § 15.206(d), permitted the Sealift Command to amend the solicitation and then accept Presidential's first and second revised proposals.  Intervenor's Mot. at 10-11.  FAR § 15.206(d) provides: "If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection." Given the regulation's references to "the alternate solution" and the protection of a bidder's information, FAR § 15.206(d) is aimed at permitting amendments that involve innovative or novel approaches to procurement requirements, not amendments that attempt to remedy a late proposal.

[26]In this instance, it is not evident that the late receipt of Presidential's second revised proposal would have had the effect of eliminating Presidential from the competition.  Late receipt of the second revision might have meant that Presidential would be barred from receiving the

"eliminated" under FAR § 15.206(c) simply begs the ultimate question in this case: whether FAR § 52.215-1(c)(3)(ii)(A) precluded the Military Sealift Command from accepting Presidential's first and second revised proposals.[27]

### C. The Contracting Officer's Contravention of Legal Requirements

By issuing Amendments 9 and 12 to the solicitation and thus accepting Presidential's first and second revised proposals, the Contracting Officer contravened the "late is late" rule under FAR § 52.215-1(c)(3)(ii)(A). First, the plain language of FAR § 52.215-1(c)(3)(ii)(A) precluded the Sealift Command's consideration of Presidential's revised proposals, and Presidential did not satisfy any of the exceptions contained in that rule. *See* FAR § 52.215-1(c)(3)(ii)(A) (late proposals "will not be considered" unless the exceptions noted are met). Second, the government and Presidential have failed to demonstrate that *post-hoc* solicitation amendments extending the closing date or time trump the "late is late" rule. *See supra* at 14-17 & n.27. There is simply no basis in the FAR for the view that the Contracting Officer had discretion to render the "late is late" rule a nullity. Although GAO decisions support the government's position as to the *nunc pro tunc* effect of *post-hoc* amendments, *see supra* at 12, those GAO precedents reflect "one of those Comptroller-General-created rules that is not reflected in the FAR," as conceded by Professor Nash, a harsh critic of the "late is late" rule. Ralph C. Nash & John Cibinic, *Late Final Proposal Revisions: The Final Straw!*, Nash & Cibinic Report, Vol. 18, No. 4, ¶ 16 (1997). Those GAO decisions are not persuasive and they will not be adopted.[28]

More broadly, adopting the government's construction of the "late is late" rule would allow the government arbitrarily to claim in some circumstances that the rule precludes it from

---

award based on that revision, but not that Presidential's prior proposals were also eliminated from consideration.

[27]Even if this court accepted the government's and Presidential's interpretation of FAR § 15.206(c), FAR § 52.215-1(c)(3)(ii)(A) would still control. As Geo-Seis notes, Pl.'s Resp. at 6, a cardinal rule of statutory interpretation is that the specific provisions of a regulatory scheme control over more general provisions. *See Bulova Watch Co. v. United States,* 365 U.S. 753, 758 (1961) ("[I]t is familiar law that a specific statute controls over a general one."); *Sun City Cmty. Hosp., Inc. v. United States*, 624 F.2d 997, 1003 (Ct. Cl. 1980) ("The general rule of interpretation is that general terms yield to more specific ones"). FAR § 52.215-1(c)(3)(ii)(A) specifically addresses the consequences of a late proposal and must be given precedence over any potentially conflicting interpretation of FAR § 15.206(c), which is principally concerned with the issuance of amendments to solicitations.

[28]Specifically, the court abjures the holding of the GAO decision in this case, *Matter of Geo-Seis Helicopters*, Nos. B-299175, B-299175.2, as well as those of the decisions in *Micromass*, 1998 WL 129882; *Ivey Mech.*, 1996 WL 478103; *Viacom Int'l*, 1994 WL 125250; *Fort Biscuit*, 71 Comp. Gen. 392; and *Institute for Advanced Safety Studies*, 1986 WL 63783.

considering a late proposal and in other circumstances to assert that the rule is not a bar to issuing amendments to the solicitation that would permit such consideration. The plain language of FAR § 52.215-1(c)(3)(ii)(A) does not support the government's interpretation that the "late is late" rule is a sort of one-way ratchet, always operating in the government's favor. *See United States v. Verduchi*, 434 F.3d 17, 24 (1st Cir. 2006) ("The statutory authorization in the [act] for equitable adjustment does not say it is a one-way ratchet."); *Falconwood Corp. v. United* States, 422 F.3d 1339, 1352 n.6 (Fed. Cir. 2005) (in tax case, rejecting government's argument that "Commissioner of Internal Revenue enjoys what amounts to unfettered discretion to apply the step transaction doctrine in those cases where its application would benefit the government – a one-way ratchet of sorts. . . . Treasury cannot with one hand promulgate consolidated return regulations that have the force and effect of statutory law, and, with the other, require a taxpayer under the guise of the step transaction doctrine to proceed contrary to the regulations but only when to the government's benefit."); *Association of Am. R.R. v. Surface Transp. Bd.,* 161 F.3d 58, 63 (D.C. Cir. 1998) ("We do not find in [the statute] a clear expression of congressional intent to create a one-way ratchet, permitting deregulation only, without subsequent adjustment."). The late-bid rule "may seem harsh, [but] it alleviates confusion, ensures equal treatment of all offerors, and prevents an offeror from obtaining a competitive advantage that may accrue where an offeror is permitted to submit a proposal later than the deadline set for all competitors." *Argencord*, 68 Fed. Cl. at 173 (quoting *Matter of PMTech, Inc.*, No. B-291082, 2002 WL 31303100, at *2 (G.A.O. Oct. 11, 2002)).[29]

In the final analysis, the policy reasons for or against the "late is late" rule are matters within the purview of the FAR Councils, not this court. The FAR Councils specifically addressed and resolved those policy issues in the 1997 reconsideration of the FAR, and this court should not undercut that resolution by a contrary decision in this case. In short, the court will apply the FAR as written, not as the government and Presidential urge that it should have been written. The refusal of the Military Sealift Command's Contracting Officer to adhere to the categorical reality of the "late is late" rule renders arbitrary her decision to accept Presidential's first and second revised proposals.

─────────────────

[29]Presidential argues that *Argencord* is inapposite because in that case the agency simply chose not to issue *post-hoc* amendments to the solicitation. Intervenor's Mot. at 13-14. This case is distinguishable from *Argencord* in that respect, but *Argencord* emphasizes that the rule might not always redound to the government's benefit. *Argencord*, 68 Fed. Cl. at 173.

Moreover, Presidential's argument highlights the key difficulty of the interpretation of FAR § 52.215-1(c)(3)(ii)(A) that Presidential and the government urge upon this court. Namely, under their interpretation, the contracting officer would always be in a position to wait to see which, if any, offerors submitted late proposals and then, on the basis of the identity of the offerors, decide whether to enforce the "late is late" rule or to issue an amendment to allow the agency to consider the offerors' late proposals. That sort of discretion in the contracting officer's hands has no basis in the FAR.

### D. Prejudice to Geo-Seis

Having found the actions of the Sealift Command's Contracting Officer to be "arbitrary" and "not in accordance with law," 5 U.S.C. § 706(2)(A), the court must now determine whether her conduct prejudiced Geo-Seis in the procurement process. *See Bannum*, 404 F.3d at 1351; *Advanced Data Concepts*, 216 F.3d at 1057. Regarding the Technical Quality of Geo-Seis's proposal, the SSA determined that Geo-Seis's proposal was "essentially technically equal" to Presidential's and [***]'s proposals and superior to that of [***]'s bid. AR 353-55 (Source Selection Decision Document). On Past Performance, Geo-Seis received a higher Past Performance rating than any of the three other competitors. *Id.* at 354-55. Geo-Seis's bid price was [***] than [***]'s, but [***] than [***]'s. *Id.* at 354. With Presidential's revised proposals excluded, the competition would have been reduced to a choice between Geo-Seis and [***]. In sum, Geo-Seis would "have been in the zone of active consideration," *Gentex Corp. v. United States,* 58 Fed. Cl. 634, 654 (2003), and "there was a substantial chance it would have received the contract award" had the Sealift Command's Contracting Officer not improperly accepted Presidential's first and second revised proposals. *Galen Med. Assocs.*, 369 F.3d at 1331 (citation omitted); *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 220-21 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). Therefore, Geo-Seis has demonstrated that the Sealift Command's decision to consider Presidential's revised proposals prejudiced Geo-Seis.

### E. Equitable Relief

Geo-Seis requests that this court permanently enjoin the Sealift Command from further performance of the contract with Presidential. Pl.'s Cross-Mot. at 34-36. In applying the four-factor test for injunctive relief, *see supra*, at 8 (quoting *PGBA*, 389 F.3d at 1228-29), Geo-Seis is in a relatively strong position because it has succeeded on the merits and thus has satisfied the first factor. In determining whether Geo-Seis will suffer irreparable harm if the court denies the injunctive relief requested, this court begins with the question whether Geo-Seis has an adequate remedy at law. Although the "mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages," *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 317 (2004), by statute, in a bid-protest case, the court is very constrained in the monetary relief it can grant. *See* 28 U.S.C. § 1491(b)(2) ("any monetary relief shall be limited to bid preparation and proposal costs"). Thus, in a bid protest, "[a] lost opportunity to compete on a level playing field for a contract . . . has been found sufficient to prove irreparable harm." *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000); *see also Hospital Klean*, 65 Fed. Cl. at 624 ("Here, absent injunctive relief, [plaintiff] will lose the opportunity to earn the profit it would have made under this contract.").[30] Given the Sealift Command's Contracting Officer's contravention of FAR § 52.215-1(c)(3)(ii)(A) and the Command's erroneous award of a contract to Presidential, Geo-Seis has demonstrated that this court's failure

---

[30]"Support also exists for the proposition that the denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm." *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 n.25 (2000) (citations omitted).

to enjoin the Command's performance of the contract with Presidential would cause Geo-Seis irreparable harm.[31]

In balancing the hardships among Geo-Seis, the government, and Presidential, the court must weigh the potential harm to Geo-Seis if injunctive relief is not awarded against the potential harm to the government and Presidential if such relief is granted. The hardship that would befall Geo-Seis in the absence of injunctive relief is evident – it would lose the opportunity to perform the contract that the Sealift Command erroneously awarded to Presidential. As to the hardship to the government, Geo-Seis argues that an injunction would "result in no meaningful harm to the United States because it has several different options for replenishment of vessels in the Pacific." Pl.'s Cross-Mot. at 35. In particular, Geo-Seis notes that as a substitute for the VERTREP operations currently being performed by Presidential, the Sealift Command could use U.S. Navy helicopters, conduct ship-to-ship connected underway replenishment ("CONREP"),[32] or replenish ships ashore. *Id.*

The government in effect concedes that these alternatives exist, but it emphasizes that pursuing any of them would come at a cost. Def.'s Cross-Mot. at 33-34. The government's position in this connection is amply supported by the declarations of two U.S. Navy officers serving at the Military Sealift Command and familiar with VERTREP operations. The officers, Captain Michael E. Cross and Commander Willie Burke, Jr., explain that (1) no U.S. Navy helicopters are currently assigned to the supply ships on which the Presidential helicopters are currently deployed, (2) reassigning personnel and helicopters to these VERTREP operations would be difficult and would divert these men and women from other critical warfighting

---

[31]The government and Presidential argue that Geo-Seis has not suffered irreparable harm because Geo-Seis did not file its protest with GAO early enough to obtain an automatic stay of performance under 31 U.S.C. § 3553(d)(3)-(4) and because Geo-Seis did not seek injunctive relief in this court until four months after the Military Sealift Command awarded the contract to Presidential. Def.'s Cross-Mot. at 32; Intervenor's Mot. at 28. Geo-Seis concedes that it did not seek a an automatic stay of performance because a scheduling conflict for one of Geo-Seis's principals delayed the debriefing provided by the Sealift Command, but it points out that following GAO's denial of Geo-Seis's protest, it promptly filed suit in this court, at which time Presidential had not mobilized the two helicopters of ALPHA detachment. Pl.'s Resp. at 20-21. Subsequently, Geo-Seis diligently pursued its claim, and this court finds no basis to conclude that Geo-Seis's failure to obtain an automatic stay is fatal to its claim that a denial of equitable relief would result in irreparable harm. A different finding might have been made if Geo-Seis had not at a very early stage of this case sought temporary injunctive relief from this court. *See PGBA*, 60 Fed. Cl. at 221.

[32]CONREP is a method of replenishing a ship whereby the supply ship and the ship being replenished are connected with cables, across which supplies are transferred while the ships are underway at sea. *See* Def.'s Cross-Mot., Decl. of Commander Willie Burke, Jr., U.S. Navy, at 1-2 (May 2, 2007).

missions, (3) CONREP operations are inherently more dangerous than VERTREP operations because of the close proximity of two sailing ships and because CONREP evolutions are lengthier, leaving ships more vulnerable to attack, and (4) in-port replenishment requires ships to divert from their missions and enter ports where they are vulnerable to an attack similar to the suicide bombing of the U.S.S. Cole in October 2000 while it was harbored in Aden, Yemen. Def.'s Cross-Mot., Decl. of Commander Willie Burke, Jr., U.S. Navy, at 2-3 (May 2, 2007), Decl. of Captain Michael E. Cross, U.S. Navy, at 1-2 (Mar. 16, 2007).

As to the hardship that an injunction would cause for Presidential, the court heard testimony from Presidential's chief financial officer, Mr. Steven A. Phillips, during the evidentiary trial held on May 30, 2007.  According to Mr. Phillips, through April 2007 Presidential had incurred $[***] in expenses related to the deployment of ALPHA detachment,[33] including $[***] per month to lease the two French Puma helicopters, $[***] for Presidential's employee payroll (*e.g.,* to pay pilots, mechanics, etc.), and $[***] for contract labor.  Tr. 73:19-23, 79:25 to 80:7, 81:1-2, 95:17 to 96:20 (May 30, 2007); Intervenor's Mot., First Decl. of Steven A. Phillips, Chief Financial Officer, Presidential, ¶ 6 (May 3, 2007).[34]  As of May 30, 2007, of the $[***] expended, Presidential had only billed the Sealift Command for $[***] because Presidential's compensation under the contract is based in part on the number of hours the helicopters fly and Presidential bills the Command at the end of each month after tallying the monthly flight hours.  Tr. 96:12 to 97:9 (Test. of Phillips) (May 30, 2007).  Presidential thus has pre-funded sunk costs that are recovered gradually over the course of its contract with the Sealift Command.

Mr. Phillips also testified that Presidential has incurred costs associated with preparing for the expectancy that Sealift Command will exercise its option for BRAVO detachment, whose deployment is scheduled for October 2007.  Tr. 86:6 to 87:1, 106:8-14, 109:2 to 110:1 (May 30, 2007); AR 346 (Solicitation Amendment 11 (Aug. 11, 2006)).  Presidential purchased $[***] in spare parts for that detachment and committed an additional $[***] to acquire and lease three Puma helicopters, delivered in parts and then assembled by Presidential.  Tr. 86:6 to 87:1, 106:8-14, 109:2 to 110:1 (Test. of Phillips) (May 30, 2007).[35]  Mr. Phillips also indicated that

---

[33]Through March 2007, Presidential had incurred $[***] in expenses related to ALPHA detachment, Intervenor's Mot., First Decl. of Steven A. Phillips, Chief Financial Officer, Presidential, ¶ 5 (May 3, 2007), and Presidential incurred an additional $[***] in April 2007.  Tr. 96:12-14, 97:15-25 (May 30, 2007).

[34]As of May 2, 2007, ALPHA detachment had deployed aboard the auxiliary fleet support ship U.S.N.S. *San Jose*.  Def.'s Cross-Mot., Decl. of Commander Willie Burke, Jr., U.S. Navy, at 3 (May 2, 2007); *see* USNS San Jose (T-AFS 7), http://www.msc.navy.mil/SanJose (last visited July 11, 2007).

[35]BRAVO detachment will include two helicopters, plus a spare.  Tr. 105:14 to 106:4 (Test. of Phillips) (May 30, 2007).  Presidential had a subsidiary purchase the three helicopters,

Presidential – to ensure that it could meet the October 2007 deployment date for BRAVO detachment – has work underway to obtain the necessary Federal Aviation Administration ("FAA") certifications for its pilots, mechanics, and helicopters, a process that takes two to three months. Tr. 102:14 to 105:2 (May 30, 2007); *see* AR 194-95, 203-05 (Solicitation §§ C 3.4, C 4.2.1, C 6.6.1-6.6.2, C 6.6.9(1)-(2), C 6.7.1) (noting various FAA certification requirements). Finally, Mr. Phillips estimated that if the government terminated its contract with Presidential for convenience, Presidential would have a claim against the government for approximately $[***]. Tr. 108:12-22 (May 30, 2007).[36]

Balancing the hardships between the competing claims of Geo-Seis, on the one hand, and the government and Presidential on the other, the court concludes that enjoining the Sealift Command's performance of the contract as to the ALPHA and BRAVO detachments would work a serious hardship on the government and Presidential. As to ALPHA detachment, the detachment, as of May 2, 2007, was already deployed aboard the U.S.N.S. *San Jose*, and Presidential has committed substantial resources to that deployment. Def.'s Cross-Mot., Decl. of Commander Willie Burke, Jr., U.S. Navy, at 3 (May 2, 2007); Tr. 95:17 to 96:20 (Test. of Phillips) (May 30, 2007). An injunction as to BRAVO detachment also would severely affect the operations of the Sealift Command, stopping indefinitely the planned deployment of that detachment. The hardship to Presidential if performance under the BRAVO detachment option were enjoined is only slightly smaller. Presidential has incurred significant costs to prepare for the expectancy that the Sealift Command will exercise its option for BRAVO detachment, whose deployment is now less than three months away. The declarations of Captain Cross and Commander Burke highlight the operational disruption that an injunction as to ALPHA and

---

and then it leased the helicopters from the subsidiary. Tr. 94:17 to 95:1 (Test. of Phillips) (May 30, 2007). The purchase of the three helicopters closed on May 14, 2007, and Presidential's lease calls for lease payments of $[***] per month. Intervenor's Mot. to Suppl. the Record, Second Decl. of Phillips ¶¶ 2-3 (June 7, 2007).

[36]For two reasons, Mr. Phillips's $[***] estimate probably overstates the claim Presidential might plausibly have against the government. First, that figure incorporates $[***] that Presidential plans to spend for the spare parts, acquisition, and *future* leasing of the three helicopters for BRAVO detachment, but with the detachment's deployment not set to begin until October 2007, Presidential has spent only a portion of that figure to date. Tr. 86:6 to 87:1, 106:8-14, 109:2 to 110:1 (Test. of Phillips) (May 30, 2007); Intervenor's Mot. to Suppl. the Record, Second Decl. of Phillips ¶¶ 2-3 (June 7, 2007). Second, Mr. Phillips's estimate assumes that the unassembled Puma helicopters and their associated spare parts would have no value to Presidential in the event the government terminates the contract for convenience because the market for these "very specialized French aircraft" is quite small. Tr. 101:14-20, 109:2 to 110:25 (May 30, 2007). While Mr. Phillips's description of the market might well be accurate, it seems problematic that the unassembled helicopters and the spare parts would have *no* value, particularly if the Command ultimately awarded a contract for BRAVO or CHARLIE detachments to another contractor, for whom those items would be valuable.

BRAVO detachments would bring.  The court accordingly concludes as to ALPHA and BRAVO detachments that the hardship to the government and Presidential outweighs that to Geo-Seis.

The equitable powers of this court, however, can be calibrated to fit particular circumstances.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims.") (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).  The factors that militate against enjoining the Sealift Command's performance as to ALPHA and BRAVO detachments are not nearly as persuasive respecting CHARLIE detachment.  Because the deployment of that detachment is not set to begin until October 2008, and because there is no evidence that Presidential has incurred expenses related to that option, AR 346 (Solicitation Amendment 11 (Aug. 11, 2006)), injunctive relief granted at this date respecting that detachment would not cause undue hardship to the Sealift Command's operations.

The final factor in the court's analysis is whether granting the plaintiff's prayer for injunctive relief would serve the public interest.  This court "give[s] due regard to the interests of national defense and national security," 28 U.S.C. § 1491(b)(3), in analyzing the public interest in this case.  Injunctive relief granted by this court might affect personnel and assets engaged in Operation Enduring Freedom, Operation Iraqi Freedom, and the Global War on Terrorism.  *See* Def.'s Cross-Mot., Decl. of Commander Willie Burke, Jr., U.S. Navy, at 1 (May 2, 2007), Decl. of Captain Michael E. Cross, U.S. Navy, at 2 (Mar. 16, 2007).  "Public interest . . . militates against awarding injunctive relief when national defense and national security interests are concerned," *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997), but this court will not "blindly accede to [national security] claims."  *Harris Corp. v. United States*, 628 F. Supp. 813, 822 n.13 (D.D.C. 1986) (citation omitted).  In essence, "'allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to the parties or to the public.'"  *OTI America, Inc. v. United States*, 68 Fed. Cl. 646, 660 (2005) (quoting *Gentex*, 58 Fed. Cl. at 655)).  While giving national security concerns due consideration, this court will balance the "overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Hospital Klean,* 65 Fed. Cl. at 624 (citing *Gentex*, 58 Fed. Cl. at 654).

With these considerations in mind, the court finds that the public interest would be served by granting injunctive relief only as to CHARLIE detachment.  Given the disruptive consequences to the Sealift Commond of halting the ALPHA deployment and delaying indefinitely the BRAVO deployment, for those detachments national security concerns trump other considerations.  *See Cincom Systems*, 37 Fed. Cl. at 269.  As a result, the court declines to set aside the Sealift Command's award to Presidential under Contract No. N00033-07-C-1004 respecting the first two detachments, ALPHA and BRAVO, and the Command may exercise any of the options in the contract that are related to ALPHA and BRAVO detachments.  With CHARLIE detachment's deployment more than a year away, however, the public's interest in a fair procurement process must prevail as to that segment of the contract.  *See Hospital Klean,* 65 Fed. Cl. at 624.  Accordingly, in balancing the factors pertinent to injunctive relief, the court

concludes that Geo-Seis is entitled to an injunction barring the Sealift Command from exercising in favor of Presidential any of the options associated with CHARLIE detachment in Contract No. N00033-07-C-1004.  Should the Command choose to employ a contractor to carry out the deployment of CHARLIE detachment as outlined in the Solicitation, it must either: (1) reevaluate for separate award only the proposals of those offerors whose second revised proposals were timely submitted and limit consideration of Presidential for such an award to its initial offer of July 14, 2005 or (2) conduct a resolicitation for the deployment of CHARLIE detachment.

### F. Bid Preparation Costs

In bid protest cases, the Tucker Act empowers this court to award a limited form of monetary relief – "bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).  "[A] losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposal submitted was arbitrary or capricious or in violation of applicable statute or regulation." *Gentex*, 58 Fed. Cl. at 656.  In light of the Military Sealift Command's contravention of FAR § 52.215-1(c)(3)(ii)(A), and the fact that the Command's award of a contract to Presidential is set aside and enjoined only insofar as the CHARLIE detachment is concerned, Geo-Seis is entitled to recover its reasonable costs incurred in bid preparation and proposal.

### CONCLUSION

For the reasons set forth, Geo-Seis's motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART.  The government's and Presidential's motions for judgment on the administrative record similarly are GRANTED IN PART and DENIED IN PART.  Presidential's motion to dismiss Geo-Seis's small business claims is GRANTED.

The Military Sealift Command's award of Contract No. N00033-07-C-1004 to Presidential is set aside and enjoined insofar as any of the options associated with CHARLIE detachment are concerned.  To employ a contractor to carry out the deployment of CHARLIE detachment, the Sealift Command must either (1) reevaluate for separate award only the proposals made by those offerors whose second revised proposals were timely submitted and limit consideration of Presidential for such an award to its initial offer of July 14, 2005, or (2) conduct a resolicitation for the deployment of CHARLIE detachment.

In addition, Geo-Seis is awarded its reasonable costs incurred in bid preparation and proposal.  Geo-Seis shall submit its reckoning of such costs on or before August 22, 2007.  The government shall respond to Geo-Seis's submission on or before September 17, 2007.

Because this decision might contain "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, it is being issued under seal.  The parties are requested to review the decision and to file proposed redactions on or before July 20, 2007.

In light of the interests of national defense and national security at issue in this case and of the particular injunctive relief that is being ordered, the court determines that there is no just reason for delay in entering a final judgment respecting equitable relief.  Accordingly, the Clerk shall enter final judgment under RCFC 54(b) as to all issues in this case except those relating to bid preparation and proposal costs.

It is so ORDERED.


<u>s/ Charles F. Lettow</u>
Judge

# ADDENDUM

**FAR CHANGES**

| Rule | Former FAR<br>(In effect prior to the 1997 FAR revisions) | Proposed FAR<br>61 Fed. Reg. 48,380, 48,392<br>(Sept. 12, 1996) | Current FAR<br>as revised by 62 Fed. Reg. 51,224, 51,259 (Sept. 30, 1997); 64 Fed. Reg. 51,837, 51,841 (Sept. 24, 1999); 64 Fed. Reg. 72,450, 72,451 (Dec. 27, 1999) |
|---|---|---|---|
| "Late is Late" Rules | **52.215-10 Late Submissions, Modifications, and Withdrawals of Proposals**<br>(a) Any proposal received at the office designated in the solicitation after the exact time specified for receipt of offers will not be considered unless it is received before award is made and–<br>(1) It was sent by registered or certified mail not later than the fifth calendar day before the date specified for receipt of offers . . .<br>(2) It was sent by mail (or telegram or facsimile, if authorized) or hand-carried . . . if it is determined by the Government that the late receipt was due primarily to Government mishandling after receipt at the Government installation;<br>(3) It was sent by U.S. Postal Service Express Mail Next Day Service-Post Office to Addressee, not later than 5:00 p.m. at the place of mailing two working days prior to the date specified for receipt of proposals . . .<br>(4) It was transmitted through an electronic commerce method authorized by the solicitation and was received by the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals;<br>(5) There is acceptable evidence to establish that it was received at the activity designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers, and the Contracting Officer determines that accepting the late offer would not unduly delay the procurement; or<br>(6) It is the only proposal received. | **52.215-1 Late proposals, modifications, and withdrawals of proposals**<br>. . .<br>**(c)(3)** *Submission, revision, and withdrawal of proposals.* Offerors are responsible for submitting offers, and any requested revisions to them, to the Government office designated in the solicitation on time. Unless the solicitation states a specific time, the time for receipt is 4:30 p.m., local time, at the designated Government office on the date that offers or requested revisions are due. Offers, and requested revisions to them, that are received in the designated office *after the time for receipt are "late" and shall be considered at the Source Selection Authority's discretion.* (Emphasis added.). | **52.215-1 Late proposals, modifications, and withdrawals of proposals**<br>. . .<br>**(c)(3)** *Submission, modification, revision, and withdrawal of proposals.*<br>(i) Offerors are responsible for submitting proposals, and any modifications or revisions, so as to reach the Government office designated in the solicitation by the time specified in the solicitation. If no time is specified in the solicitation, the time for receipt is 4:30 p.m., local time, for the designated Government office on the date that proposal or revision is due.<br>(ii)(A) Any proposal, modification, or revision received at the Government office designated in the solicitation *after the exact time specified for receipt of offers is "late" and will not be considered unless* it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and—<br>(1) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or<br>(2) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or<br>(3) It is the only proposal received. (Emphasis added.) |

| Rule | Former FAR<br>(In effect prior to the 1997 revisions) | Proposed FAR<br><br>61 Fed. Reg. 48, 380, 48,386-87 (Sept. 12, 1996) | Current FAR<br><br>as revised by 62 Fed. Reg. 51,224, 51,235 (Sept. 30, 1997) 64 Fed. Reg. 51,837, 51,839 (Sept. 24 1999); 64 Fed. Reg. 72,450, 74,451 (Dec. 27, 1999) |
|---|---|---|---|
| Further "Late is Late" Rule | **15.412 Late Proposals, Modifications, and Withdrawals of Proposals**<br><br>. . .<br><br>**(c)** Proposals, and modifications to them, that are received in the designated Government office after the exact time are "late" and shall be considered only if (1) they are received before award is made, and (2) the circumstances meet the specific requirements of provision at 52.215-10, Late Submissions, Modifications, and Withdrawals of Proposals. | **15.207 Submission, modification, revision, and withdrawal of proposals**<br><br>. . .<br><br>**(b)** Proposals, modifications, and revisions received in the designated Government office *after the exact time specified are "late" but may be considered if doing so is in the best interests of the government*. Government mishandling or fault need not be established in order to accept a late offer. The contracting officer shall promptly notify any offeror if its proposal, modification, or revision was received late and whether or not it will be considered, unless contract award is imminent and the notice proscribed in 15.803(b) would suffice. (Emphasis added.) | **15.208 Submission, modification, revision, and withdrawal of proposals**<br><br>. . .<br><br>**(b)(1)** Any proposal, modification, or revision, that is received at the designated Government office *after the exact time specified for receipt of proposals is "late" and will not be considered unless* it is received before award is made, the contracting officer determines that accepting the late proposal would not unduly delay the acquisition; and—<br>(i) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or<br>(ii) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of proposals and was under the Government's control prior to the time set for receipt of proposals; or<br>(iii) It was the only proposal received. (Emphasis added.) |

| **Rule** | **Former FAR**<br>(In effect prior to the 1997 revisions) | **Proposed FAR**<br>61 Fed. Reg. 48,380, 48, 386<br>(Sept. 12, 1996) | **Current FAR**<br>(62 Fed. Reg. 51,224, 51,235<br>(Sept. 30, 1997) |
|---|---|---|---|
| Amending Solicitation | **15.410(a)** **Amendment of solicitations before closing date.**<br>(a) After issuance of a solicitation, but before the date set for receipt of proposals, it may be necessary to (1) make changes to the solicitation, including, but not limited to, significant changes in quantity, specifications, or delivery schedules, (2) correct defects or ambiguities, or (3) change the closing date for receipt of proposals. Standard Form 30, Amendment of Solicitation/ Modification of Contract (53.301-30), shall be used for amending a request for proposals (RFP). | **15.205** **Amending the solicitation.**<br>(a) When, either before or after receipt of proposals the Government changes, relaxes, increases, or otherwise modifies  its requirements, the contracting officer shall issue an amendment to the solicitation.<br>(b) Amendments issued before the established time and date for receipt of proposals shall be issued to all parties receiving the solicitation, and should be issued in the same manner as the solicitation.<br>(c) Amendments issued after the established time and date for receipt of proposals should be issued --<br>(1) *To all offerors still eligible for award*; and<br>(2) In the same manner as the solicitation.<br>(d) Oral notices may be used when time is of the essence. The contracting officer shall document the contract file and formalize the notice with an amendment. (Emphasis added.) | **15.206(a)-(d)** **Amending the solicitation.**<br>(a) When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation.<br>(b) Amendments issued before the established time and date for receipt of proposals shall be issued to all parties receiving the solicitation.<br>(c) Amendments issued after the established time and date for receipt of proposals shall be issued *to all offerors that have not been eliminated from the competition.*<br>(d) If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection (see 15.207(b) and 15.306(e)). (Emphasis added.) |

28